[No. B103560. Second Dist., Div. Four. July 23, 1997.]

DOMINGUEZ ENERGY, L.P., Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES, Defendant and Appellant.

**COUNSEL**

De Witt W. Clinton, County Counsel, and Albert Ramseyer, Deputy County Counsel, for Defendant and Appellant.

Bright & Brown, James S. Bright and Gregory C. Brown for Plaintiff and Respondent.

**OPINION**

**VOGEL (C. S.), P. J.—**

### INTRODUCTION

Dominguez Energy, L.P. (hereafter Dominguez) seeks a partial refund of property taxes for the 1990 tax year on its working interest in an oil and gas

lease. The lease is expected to have a useful life until the year 2015. Since acquiring the interest in 1983, Dominguez has performed and has scheduled ongoing environmental remediation of the property, including sump removal, abandonment of unused wells, wastewater discharge, capture of leaking hydrocarbons, and restoration of the surface land around abandoned wells. The issue here is how the expenses of these environmental cleanups should be treated in the assessor's valuation of the property under the income capitalization method of appraisal. The Los Angeles County Assessor concluded that the costs of environmental remediation should be allocated to the final year of the lease, which results in a higher property tax assessment for the 1990 tax year than if the expenses were allocated as scheduled, which is the method advocated by Dominguez. Dominguez contends the assessor's method violates Revenue and Taxation Code section 402.1 (hereafter section 402.1), which provides that in assessing the value of land the assessor "shall consider the effect upon value of any enforceable restrictions to which the use of the land may be subjected," including but not limited to "[e]nvironmental constraints applied to the use of land pursuant to provisions of statutes."

The Los Angeles County Assessment Appeals Board No. 2 upheld the assessor's valuation. In Dominguez's action for partial refund of taxes (Rev. & Tax. Code, § 5140), the superior court held the assessor's method violates section 402.1; the court remanded the matter to the board for reassessment in conformity with the court's decision. In compliance, the board reassessed the property, which reduced the assessment by $2,180,002, and reduced the tax by $23,113. The County of Los Angeles (hereafter the assessor) appeals from the superior court's judgment granting partial tax refund.

We affirm the trial court's decision that the assessor's method of valuation is arbitrary, in excess of discretion, and contrary to standards prescribed by law in section 402.1.

## BACKGROUND

The underlying facts are virtually undisputed.

### The Property

The property consists of three parcels located in the City of Carson and an unincorporated area of Los Angeles County, known as Dominguez Hills or Rancho Dominguez. The oil and gas lease is known as the "Reyes Lease." It was executed in 1923 when the surface land was agricultural. The surrounding area is now mixed-use commercial and industrial.

The working interest in the oil and gas production is owned 50-50 between Dominguez and Unocal. The surface rights are owned by Dominguez Properties L.P., which is a separate limited partnership composed of the same partners as Dominguez.

The lease and operating agreement contain provisions requiring that at termination the operator shall remove all facilities and restore the surface land as nearly as practicable to its original condition.

### Environmental Compliance

Dominguez acquired its interest in 1983 from Shell Oil Company. In a separate action Dominguez is suing Shell Oil Company, contending that during the 60 prior years of the lease Shell contaminated the property and failed to comply with environmental laws, and in the sale transaction failed to disclose material facts to Dominguez.

Dominguez has performed or scheduled numerous projects to bring the property into compliance with environmental laws. The assessor does not dispute the amounts incurred or projected. Although the assessor disputes to some extent *when* the law requires compliance, the assessor concedes that Dominguez is required by statute or regulation to perform these projects. The only real point of dispute is the assessor's policy of allocating certain expenses to the last year of useful life of the lease. Therefore, for the purpose of factual background, we describe Dominguez's projects in the words of Dominguez's respondent's brief:

"After obtaining Shell's interest in the property in 1983, Dominguez investigated and discovered extensive existing environmental problems with the property. . . . These problems included the presence of unabandoned sumps containing oil, hazardous drilling muds from the early years of the field, oil field waste and other hazardous materials, the presence of numerous improperly abandoned or unabandoned oil and gas wells which were in danger of leaking or causing other environmental problems, areas of contaminated soils, a large ravine area filled with wastes of various types, and at least one well which had blown out and had never been controlled nor properly abandoned, thus leaking hydrocarbons. . . . Numerous statutes, ordinances, and regulations required the cleanup conducted (and still being conducted) by Dominguez and Union of oil-soaked earth, oil and gas-related abandoned sumps, hazardous materials and leaking, improperly abandoned oil wells. . . . [¶] On a local level, the Carson Municipal Code, section 9148.2(E) states that: 'Within 90 days after abandonment of any well, earth and sumps used in drilling or producing or both, shall be filled and the

drilling site restored as nearly as practical to its original condition.' [Dominguez] has undertaken the sump removal and surface restoration required by this Carson Municipal Code provision. The work undertaken by Respondent Dominguez was primarily related to sumps, dumpsites and the areas surrounding abandoned wells. Dominguez was required to clean up those sites pursuant to the Carson Municipal Code, section 9148.2(e). . . . Such costs are primary among those which the Assessor refused to currently recognize. [¶] On a regional level . . . [t]he concentration of oil-soaked soil far exceeded that allowed by the Regional Water Quality Control Board. Likewise, the hazardous materials found exceeded standards prescribed by the United States Environmental Protection Agency and the California Department of Health. As a result of the potential for those materials to reach the groundwater and other waters of the state, the Regional Water Quality Control Board was involved and provided guidance over the cleanup operations. . . . [¶] Similarly, with respect to soils that were excavated and treated on-site, Dominguez was required to obtain waste water discharge permits from the Regional Water Control Board. . . . The removal of contaminated soil also required the preparation of excavation plans under regulation of the South Coast Air Quality Management District for mitigation of potential emissions of volatile organic compounds. . . . The County Sanitation District has required Dominguez to install a benzene removal system for waste water prior to discharge of water to the sewer. . . . [The blown-out well] was found to be leaking methane gas and other hydrocarbon substances which potentially threatened water resources. The proper abandonment of the well and related cleanup was mandated by the laws governing the Regional Water Quality Control Board. . . . [¶] On the state level, the Division of Oil, Gas and Geothermal Resources . . . regulations mandate that all oil and gas wells idle for more than five years be abandoned unless the nonabandonment can be justified technically to the D.O.G. Due to the particular circumstances of the oil field in issue here, leaving unabandoned wells in this lease [is] particularly problematical from an environmental and public safety standpoint. Dominguez has spent and will continue [to] spend considerable amounts to bring the oil field into compliance with these D.O.G. regulations. . . . Dominguez has made substantial expenditures in order to comply with the Federal Clean Air Act in order to eliminate fugitive hydrocarbon emissions from piping valves and other equipment used in the [oil field operations]. [¶] Upon taking over ownership and operatorship of the property, Dominguez did not resist its environmental obligations. It chose to comply with applicable environmental laws rather than carry on legal battles concerning the applicability of the various statutes and regulations applicable to the property. Dominguez made a management decision to expend its funds in the actual cleanup rather than in costly resistive legal

action. . . . As a result, Dominguez has not fought the various environmental agencies involved and thus has not required them to issue cleanup orders nor to file civil or criminal actions to enforce cleanups. While undertaken pursuant to and as required by environmental regulations and statutes constraining the use of the property, the environmental efforts in issue here were not the result of formal civil or criminal legal actions instituted by the various governmental agencies involved. . . ."

## Valuation of Oil and Gas Leases

■ Oil and gas leases, which involve income-producing property, are ordinarily evaluated based on the income capitalization method of appraisal. (*California Portland Cement Co.* v. *State Bd. of Equalization* (1967) 67 Cal.2d 578, 583-584 [63 Cal.Rptr. 5, 432 P.2d 700]; *Lynch* v. *State Bd. of Equalization* (1985) 164 Cal.App.3d 94, 104 [210 Cal.Rptr. 335]; Cal. Code Regs., tit. 18, § 468; Cal. St. Bd. of Equalization, Assessors Handbook AH 566.)

The State Board of Equalization's rule on oil and gas producing properties states, "The market value of an oil and gas mineral property interest is determined by estimating the value of the volumes of proved reserves. Proved reserves are those reserves which geological and engineering information indicate with reasonable certainty to be recoverable in the future, taking into account reasonably projected physical and economic operating conditions. Present and projected economic conditions shall be determined by reference to all economic factors considered by knowledgeable and informed persons engaged in the operation and buying or selling of such properties, e.g., capitalization rates, product prices and operation expenses." (Cal. Code Regs., tit. 18, § 468, subd. (b).)

The State Board of Equalization's general rule on the income approach to value states, "Using the income approach, an appraiser values an income property by computing the present worth of a future income stream. This present worth depends upon the size, shape, and duration of the estimated stream and upon the capitalization rate at which future income is discounted to its present worth. . . . [¶] . . . [¶] The amount to be capitalized is the net return which a reasonably well informed owner and reasonably well informed buyers may anticipate on the valuation date that the taxable property existing on that date will yield under prudent management and subject to such legally enforceable restrictions as such persons may foresee as of that date. Net return, in this context, is the difference between gross return and gross outgo. Gross return means any money or money's worth which the

property will yield over and above vacancy and collection losses, including ordinary income, return of capital, and the total proceeds from sales of all or part of the property. Gross outgo means any outlay of money or money's worth, including current expenses and capital expenditures (or annual allowances therefor) required to develop and maintain the estimated income. Gross outgo does not include amortization, depreciation, or depletion charges, debt retirement, interest on funds invested in the property, or rents and royalties payable by the assessee for use of the property. Property taxes, corporation net income taxes, and corporation franchise taxes measured by net income are also excludable from gross outgo." (Cal. Code Regs., tit. 18, § 8, subds. (b), (c).)

The State Board of Equalization's assessor's handbook on oil and gas producing properties states, "Certain costs (i.e., expenses) are generally allowed as deductions from gross income, in making an income-type appraisal of an oil or gas producing property. . . . Expenses for appraisal purposes consist only of future operating costs and other anticipated expenses, including capital expenditures." Examples given include "Lifting costs (or direct operating costs). These comprise direct field outlays such as labor and maintenance, materials and supplies, utilities, dehydration and waste water disposal, corrosion control, pulling jobs and bailing, transportation and insurance, and recompletion or redrilling." "Major outlays. Anticipated capital expenditures or large non-recurring expenses requisite to efficient recovery of oil should be deducted from future income." (Cal. St. Bd. of Equalization, Assessors Handbook AH 566, pp. 20, 21.)

*Hearing Before the Assessment Appeals Board*

Dominguez's environmental costs, many of which were allocated by the assessor to the final year of the lease, were supplied to the assessor by a copy of a September 8, 1989, internal Dominguez memorandum, estimating its projected environmental cleanup expenses on the Reyes Lease for the years 1990, 1991, and 1992. The assessor gave notice that certain costs were not to be recognized, based on two grounds: "1. Environmental cleanup costs should be placed at the end of the projected life instead of being scheduled throughout the project's life. 2. Abandonment expenses were duplicated; they were included as capital expenditures as well as abandonment expenses in years 1990-1992."[1]

In a memorandum prepared for the hearing before the assessment appeals board and in his comments at the hearing, assessor's appraiser Patrick

---

[1]Point No. 2 is not in issue here.

Gibson explained the items he reallocated to the final year. To the right of the items on Dominguez's list, Gibson labeled each expense as either environmental cleanup, abandonment, capital expenditure, or facilities. All capital expenditure items were included in full in their appropriate year as planned by Dominguez. As of 1990 there remained 114 wells to be abandoned. Dominguez scheduled 12 abandonments per year for 1990-1992. Gibson allowed the revised actual expenses of the abandonments for the 1990-1992 years. On the other hand, "All items regarding environmental cleanup or facilities removal were placed at the end of the life of the lease along with the final round of well abandonments." "Final abandonment costs total $6,763,900 were placed in the year 2015. . . . This final cost includes the plugging and abandoning of the remaining 78 wells, the abandonment of Reyes #27, . . . sewer and waterflood plant removal . . . , and environmental cleanup. . . . [¶] The placement of expenses such as those attributed to the abandonment of Reyes #27, sewer and waterflood plant removal and environmental cleanup, is at the end of the field's life. Typically, without a written notification from a government agency requiring early environmental cleanup, the Assessor normally places these costs at the end of the economic life of the lease."

The assessor's rationale was explained in Gibson's memorandum and at the hearing before the assessment appeals board. The assessor was represented at the hearing by Appraiser Gibson and by Principal Appraiser Eric Haagenson. Dominguez was represented by Michael Genewick, the vice-president for energy and environment of Watson Land Company, the general partner of Dominguez, by Al Renga, of ADR Valuation, Inc., as agent, and by Daniel Wellman, a scientific consultant with Woodward Clyde Consultants.

Gibson's memorandum stated that no orders by any governmental agency had been issued requiring environmental cleanup by Dominguez at this time. Involvement of government agencies in this case was at the voluntary request of Dominguez. Gibson repeated at the hearing, "Typically, without a written notification from a government agency requiring early environmental cleanup, the assessor normally places these costs at the end of the economic life of the lease." According to Gibson's memorandum, "Prudent operators abandon as they go, but save environmental cleanup [until] the end of the life of the lease." The reason, he asserted, is that "Mineral rights owners do not concern themselves with surface cleanup. Typical oil fields are leased to operators who have no claim to the surface."

Haagenson expanded on this rationale at the hearing. He argued that a typical oil and gas operator would "maximize profits" by postponing cleanup

as long as possible, i.e., until just before turning the land back to the surface owner in restored condition. He queried, "[I]f you were a corporate executive charged with the responsibility of maximizing the profits to your stockholders, and your stockholders are the people who own the working interest, . . . when would you incur the environmental cleanup costs? Would you do it before you had to? I don't think so. And in the interest of equalization . . . we believe that prudent operators would not incur those environmental costs until they have to. . . . We are treating [Dominguez] the same way as we treat everybody else."

Both Gibson and Haagenson argued that Dominguez had special reasons to do environmental cleanup "early," reasons which were not typical of the normal prudent oil and gas operator and which should not be recognized. They contended that unlike the typical operator who has no interest in the surface land, Dominguez was related to the surface owner, Dominguez Properties L.P., which is a partnership consisting of the same partners as Dominguez.[2] They argued that Dominguez Properties L.P. was interested in developing the surface, which gave a unique motivation to Dominguez to perform cleanup (i.e., remove facilities and restore the surface) "early." The evidence of this was as follows: In a document filed in the separate action against Shell Oil Company for fraud, Dominguez Properties L.P. stated that it was in the business of real estate development, that the Reyes Lease lands were surrounded by property developed for residential and commercial purposes and adjacent to California State University Dominguez Hills, and that Dominguez Properties L.P. wanted Shell and Union oil companies to release as much of the Reyes Lease lands as possible. Haagenson cross-examined Genewick at the hearing, asking whether the cleanup sites were near the areas that "you" (implying identity between Dominguez and Dominguez Properties L.P.) "are first going to develop." Genewick replied "[n]o," that the areas scheduled for first development were on the other side of Wilmington Avenue. Haagenson asked "Is this maybe in a second phase, then?" to which Genewick replied, "I am not exactly sure which phase. I mean there is a phased development, I have to admit to you, there is a phased development over the next ten, fifteen years for the development of this property and to retain the oil operation on the property. But that is happening all over the place." Genewick also testified that the terms of the operating agreement include that "the parties hereto agree for the benefit of the respective Lessor to surrender portions of the leased land when no longer required for oil and gas operations and to restore the surface of the leased

---

[2]Genewick testified at the hearing that Dominguez and Dominguez Properties L.P. are separate legal entities with different interests and responsibilities, although they have the same partners.

land so surrendered within the time and in the manner as a prudent Operator would do under the same or similar circumstances or within such period of time as may be mutually agreed upon by the working interest owners under such leases."

On the issue of what would be done by the prudent oil operator, Dominguez's representatives made the following points at the hearing: Genewick stated, "We think that it's prudent as business people to do it now [as distinguished from the end of the useful life of the lease] when we've got the cash and the cash flow, and while it's still economically feasible to do it and [it's] environmentally possible. We think it is better to do the work today than wait, since costs are continuing to escalate and with the uncertainty of the price of oil today, we may not have enough revenue at the end of the lease to complete the work, and I don't think that's in the best interest of the general public." He also opined, "This project is a 350-acre lease and it is very large and you can't do that overnight. We have been working on this since 1985 and it is going to take about a ten-year period for us to complete all of our abandonments and cleanup. And if you try to do that at the end of the lease you can't do it. [S]o it's prudent to start early so that by the time your oil is depleted you have minimum amounts of cleanup."

Genewick and the scientific consultant Wellman also discussed advantages to doing environmental cleanup now instead of later because current regulations allow a technique known as "land farming," which consists of disking oil-soaked soil; it was more efficient to dig up many oil-soaked sumps together to utilize this technique; they feared that in the future new regulations would be passed requiring a more expensive method of treating such soil. Wellman added that, "besides the fact that it makes good business sense to address environmental cleanups today, there is also continuing government pressure and influence to compel owners of oil field sites to do something today. Part of this pressure is the recent implementation of criminal penalties for the enforcement of environmental regulations and the willingness of federal, state and local agencies to use them."

Genewick argued there was no merit to the assessor's theory that current performance was motivated by a desire to develop the surface early. He pointed out that Unocal, who had no interest in the surface land rights, had willingly shared 50 percent of the costs of the environmental cleanup.

Haagenson asked Genewick directly, would not an operator who had no interest in the surface land "want to postpone the costs of abandonment until the very end?" Genewick replied, "That's a very difficult question to answer;

and it's a very complex question. For a person who would maybe have no ethics, you might say yes. For a person who is responsible and who cares about their contractual obligations, you have to look at . . . will I have enough money at the end of the lease to cleanup all of these things or am I going to walk away from it and try to stick somebody else, like the property owner or the public, in that . . . I think a responsible company, and you're seeing it more and more with the majors, are actually starting to do the work now . . . because the other risk is that the environmental regulations are getting so bad and the requirements are getting tighter and tighter and so expensive it just makes more sense to do it today than wait until the end and take that risk that it might cost you five times as much." Genewick provided a list of other oil operations where, he asserted, the operators were doing environmental cleanup as they go.

Renga argued that the practical effect of the assessor's "allocation" of these costs to the final useful year of the lease, the year 2015, was to discount them so greatly as to disregard them.[3]

*Assessment Appeals Board Decision*

The assessment appeals board upheld the assessor. It found: "1. The methodology utilized by the assessor is consistent with the appraisal of all other oil properties. 2. Revenue and Taxation Code Section 402.1 requires the assessor to consider the effect of any enforceable restrictions to which land may be subjected. 3. Footnotes following Section 402.1 [*sic*] provide: 'In determining the fair market value of property, an assessor is only required to consider governmentally imposed land restrictions.'[4] 4. The applicant admitted that they had not been given notice by any governmental agency to perform the work prior to the end of the lease. 5. The surface rights are vested in another entity which is owned and controlled solely by the applicant. 6. It is reasonable for the board to conclude that the underlying motivation to perform the work now is to prepare for its early development for a higher and better use."

---

[3]In its trial brief in superior court, Dominguez argued, without contradiction by the assessor, that "by moving the governmentally mandated expenses to the end of the life of the lease, the Assessor has in reality refused to take them into account at all. [¶] As indicated above, the Assessor discounts the value of all future expenses (and revenue). In the present case, the discount rate used was 19.03% per year. . . . The compound effect of such a high discount rate from 25 years in the future [1990 to 2015] is staggering. The present value of one dollar discounted at 19.03% from 25 years in the future is just over one cent ($0.01284)."

[4]By "footnotes following section 402.1" perhaps the board meant some annotation of the decision in *Carlson* v. *Assessment Appeals Bd. I* (1985) 167 Cal.App.3d 1004 [213 Cal.Rptr. 555] holding that under section 402.1 the assessor is not required to consider privately imposed deed restrictions but "only required to consider governmentally imposed land restrictions . . . ." (*Carlson, supra,* summary at p. 1004.)

*Superior Court Decision*

Dominguez filed a claim for refund in superior court. The parties submitted trial exhibits based on the administrative record and trial briefs. They disputed whether the trial court's review was for substantial evidence, as contended by the assessor, or de novo on a question of law, as contended by Dominguez. The assessor argued it was proper to presume the hypothetical prudent operator would postpone cleanup expenses to the end, that Dominguez was not typical, because it had an interest in developing the surface, and that section 402.1 does not apply because no government agency issued an order compelling compliance. Dominguez argued that its compliance was required by law and did not depend upon the existence of an order, that the assessor violated section 402.1 by failing to consider the expenses as scheduled and penalized Dominguez for voluntarily complying with the law, that the assessor offered no evidence to support the theory that a prudent operator always postpones cleanup to the end, which was contradicted by Dominguez's evidence, and that the allegation of Dominguez's special motive was factually contradicted and legally irrelevant.

In its written memorandum opinion the trial court found: Dominguez was required by environmental laws to clean up contamination as scheduled by Dominguez; these were environmental constraints on the use of land which the assessor was required by section 402.1 to consider; the assessor's policy of refusing to recognize these expenses until the end of the projected life of the lease conflicts with section 402.1 and is arbitrary, an abuse of discretion, and contrary to standards prescribed by law. The court commented, "Hypothetically speaking, it is possible that a taxpayer might volunteer to expend sums for an environmental cleanup of certain wastes, under circumstances which are not subject to any environmental constraints imposed by statute, and that assessors in such instances could have the discretion to postpone such a business expense in applying the income method of calculation regarding oil and gas leases; however, such a record is not before this Court, in that it is faced with evidence of severe environmental contamination, highly regulated types of wastes, and statutory provisions contemporaneously affecting property value."

The court remanded the matter for reassessment in conformity with its decision. The parties agreed as to the proper revised amounts. In compliance the property was reassessed from $12,892,072 to $10,712,070 (a difference of $2,180,002) and the tax was recomputed from $136,678.38 to $113,566.58 (a difference of $23,111.80); the court rendered judgment thereon. The assessor appeals from the judgment.

## Discussion

### *Standard of Review*

█ If a taxpayer claims the assessor and assessment appeals board *erroneously applied* a *valid* appraisal method, a trial court is limited to reviewing the administrative record and may overturn the board's decision only if there is no substantial evidence in the administrative record to support it. But if the taxpayer challenges the *validity of the valuation method itself*, the trial judge is faced with a question of law, may take evidence on the validity of the method, and may overturn the assessment if the challenged method of valuation is arbitrary, in excess of discretion, or in violation of standards prescribed by law. (*Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354].) There may be " 'a fine line' " between the two types of challenges. (*Trailer Train Co.* v. *State Bd. of Equalization* (1986) 180 Cal.App.3d 565, 582 [225 Cal.Rptr. 717].)

█ The assessor suggests that because the income capitalization method is well accepted, Dominguez's challenge is to the application of that technique and is therefore subject only to substantial evidence review. Dominguez contends its challenge is primarily on the ground the assessor's method violates section 402.1, and therefore presents a question of law for de novo review, both by the trial court and this court, to determine whether the valuation method used here violates standards prescribed by law.

We agree with Dominguez that the question presented by this case is a question of law for de novo review. Before the assessment appeals board and the superior court, the assessor consistently defended the decision to allocate environmental cleanup to the end of the lease on the ground that "in the name of equalization" the assessor must apply a uniform rule, based on the assessor's view of what a hypothetical objectively prudent oil lease operator would do, rather than on what Dominguez chose to do. The assessor claimed to be treating Dominguez the same as all other oil lease operators. Indeed, the board in its findings justified the method on the ground it was consistent with the assessor's appraisal of all other oil properties. The assessor claimed that the assessor's policy is always to reallocate environmental cleanup expenses to the last year of the lease, in the absence of a governmental agency order for current cleanup, which is based on the assessor's interpretation of section 402.1. The board likewise relied on the absence of a governmental agency order for current cleanup, consistent with the assessor's interpretation of section 402.1. The assessor's declared uniform rule

and the assessor's interpretation of section 402.1 present questions of law, not mere application of an accepted valuation principle to an individual taxpayer's particular factual situation. (E.g., *Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d 14, 18-19, 25 [assessor's method of appraisal by taking acquisition cost and deducting 50 percent for depreciation regardless of a property's age or condition was invalid as a matter of law because it abandoned any attempt to distinguish properties with respect to their current value, even though, in the abstract, cost-less-depreciation is an accepted valuation method]; *Carlson* v. *Assessment Appeals Bd. I, supra,* 167 Cal.App.3d 1004, 1009, 1010 [whether assessor was required by section 402.1 to consider private deed restrictions was a question of law; the court interpreted the statute to apply only to restrictions imposed by government].)

*Analysis*

Section 402.1 currently provides in pertinent part, "(a) In the assessment of land, the assessor shall consider the effect upon value of any enforceable restrictions to which the use of the land may be subjected. These restrictions shall include, but are not limited to, all of the following: [¶] . . , [¶] (6) Environmental constraints applied to the use of land pursuant to provisions of statutes." As stated in *Carlson* v. *Assessment Appeals Bd. I, supra,* 167 Cal.App.3d at page 1010, the statute sets forth a number of nonexclusive land use restrictions, imposed by government, which the assessor must consider. As further noted by *Carlson,* the statute contains its own statement of legislative intent: "(g) It is hereby declared that the purpose and intent of the Legislature in enacting this section is to provide for a method of determining whether a sufficient amount of representative sales information is available for land under use restriction in order to ensure the accurate assessment of that land. It is also hereby declared that the further purpose and intent of the Legislature in enacting this section and Section 1630 is to avoid an assessment policy which, in the absence of special circumstances, considers uses for land that legally are not available to the owner and not contemplated by government, and that these sections are necessary to implement the public policy of encouraging and maintaining effective land use planning. Nothing in this statute shall be construed as requiring the assessment of any land at a value less than as required by Section 401 or as prohibiting the use of representative comparable sales information on land under similar restrictions when this information is available."

The trial court found, and we agree, that environmental protection statutes which require an oil and gas lease operator to take measures to prevent or repair contamination can be restrictions on land use within the

meaning of section 402.1. The assessor contends, however, that section 402.1 does not control this case, because (1) the cleanup costs claimed by Dominguez were incurred without an order from a government agency and (2) the expenditures are not for the purpose of maintaining the income stream but for the purpose of benefitting the surface land owner.

The contention that environmental constraints were not in this case "applied to the use of land pursuant to provisions of statutes," solely because no government agency specifically ordered Dominguez to clean up the property, is a crucial element of the assessment by the assessor and the board. We conclude that in this respect the assessor and the board have, as a matter of law, misinterpreted the statute. Among the other examples of "enforceable restrictions to which the use of land may be subjected," the statute lists zoning, recorded contracts with government agencies, permits, development controls, environmental constraints, hazardous-waste land-use restrictions imposed pursuant to Health and Safety Code section 25240 (which refers to easements and restrictive covenants), and recorded conservation, trail or scenic easements. (§ 402.1, subd. (a)(1)-(8).) The statute does not specifically mention enforcement orders; rather it refers to various types of restrictions.

According to the assessor's theory, Dominguez must either request that a government agency specifically order Dominguez to perform these operations or must intentionally disregard its obligations until it draws attention from the government, risking civil and criminal penalties. The assessor's interpretation discourages timely and cooperative obeyance of the law and performance of environmental protection obligations. We hold that the existence of a specific enforcement order is not a prerequisite under section 402.1 to a taxpayer's showing that the land is subject to restrictions imposed by government which affect its value. The holding of Carlson v. Assessment Appeals Bd. I, supra, 167 Cal.App.3d at page 1010, that section 402.1 contemplates only restrictions "imposed by government" was in the context of distinguishing restrictions imposed solely by private agreement. It does not support the assessor's contention that "imposed" means only "imposed by a direct order" addressing a specific situation. Restrictions can be "imposed by government" by any of the methods mentioned in subdivision (a) of section 402.1. It is significant that the code provision uses the adjective "enforceable" to qualify the kinds of restriction that come within its operation. Had the Legislature intended to make the statute applicable only to restrictions that were "enforced," it would have used that term. Clearly, the intent was to consider what limitations applied to the property, whether or not such limitations produced immediate enforcement. Property owners and

users can and should be expected to observe the restrictions without an order and without risking penalties for violation.

The assessor next suggests that the expenses in question should not be recognized currently because they are not "required to maintain the property's cash flow." The assessor refers to descriptions of the income capitalization method of appraisal as involving deduction of expenses which are "required to develop and maintain the estimated income." (Cal. Code Regs., tit. 18, § 8, subd. (c), quoted, *ante,* at p. 846, defining "gross outgo"; see 2 Ehrman & Flavin, Taxing California Property (3d ed. 1989) § 17:17 ["After relevant gross income is determined, the appraiser must deduct expenses to arrive at the net income to be capitalized. . . . [¶] Generally, all expenses necessary to maintain the flow of income are allowed."].)

There are several flaws to the assessor's argument. If the expenses are required by land use restrictions imposed by government, and the restrictions affect the value, the assessor is expressly required by section 402.1 to consider them. In addition, other statements of the income capitalization approach refer more broadly to "operation expenses." (Cal. Code Regs., tit. 18, § 468, quoted, *ante,* at p. 845 [value of oil and gas property determined by all economic factors considered by knowledgeable and informed persons in the business of buying or selling such properties, "e.g., . . . operation expenses"].) Regardless whether the performance of these projects ultimately benefits the surface land owner, they must be considered as necessary operation expenses because they are required by law.[5] The ultimate question is whether these expenses affect the value because they would be considered by knowledgeable and informed persons engaged in the operation of buying and selling oil and gas leases, anticipating the net return under prudent management subject to legally enforceable restrictions. (Cal. Code Regs., tit. 18, § 8, subd. (c).) Put another way, the question is the earnings and expenses to be anticipated by a prospective purchaser of Dominguez's working interest in this oil and gas lease. (See *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 566 [290 P.2d 544].)

This brings us back to the assessor's fundamental premise, that although these expenses are ultimately required by law, they are not required *now,* and a reasonably prudent oil and gas operator would not schedule these projects until the year of the final useful life of the lease. The assessor argues, "if the remaining years of the mineral rights lease were sold, a new lessee would not arbitrarily pay for early clean-up costs for the benefit of the surface

---

[5]We conclude the assessor's allegation that Dominguez had a special motive to develop the surface is legally irrelevant.

owner." The buyer would defer these expenses until the end, the assessor argues, because they are expenses associated with "the shut down of the investment."

Preliminarily, the assessor's contention that certain abandonment and restoration costs are not currently required is contradicted by Carson Municipal Code section 9148.2(E), which states, "Within 90 days after abandonment of any well, earthen sumps used in drilling or production, or both, shall be filled and the drilling site restored as nearly as practical to its original condition." As we have discussed, *ante*, section 402.1 does not require Dominguez to wait for an order from the City of Carson before complying with the ordinance.

The assessor's contention that any reasonably prudent oil operator would postpone these expenses until the end in order to maximize profits is pure theory supported only by the appraisers' arguments to the assessment appeals board and the superior court. In contradiction of this theory, Dominguez's representatives at the hearing gave concrete reasons based on industry experience why a responsible and reasonably prudent oil operator would perform these projects as they go. First and foremost, to postpone all of these expenses to the end, when the income is running out, poses a grave danger that the operator will be unable to perform the required decontamination and restoration and will irresponsibly shift this expense to the surface land owner or the taxpaying public. Second, at least on a large parcel such as this, the task of cleaning up everything all in the last year may be impossible. Third was a perception of increasing governmental pressure reflecting the public interest in improving the environment now rather than some distant time in the future. Fourth was a business judgment that present compliance would be less expensive than postponed compliance, both for technical reasons and because future regulation might be even stricter.

Dominguez's model of a reasonably prudent oil operator is an ethical and responsible operator who budgets for compliance with environmental regulations not only in order to comply promptly but also to avoid being unable to comply at the end of the lease. The assessor's model of a reasonably prudent oil operator is an operator who focuses only on the short term bottom line and postpones its environmental obligations as long as possible, risking that in the end the land surface owner or the general public will be burdened with the operator's obligations.

Good public policy should prefer Dominguez's model. The ultimate test under the income capitalization method is the net return anticipated "under

prudent management and subject to such legally enforceable restrictions [as may be foreseen]." (Cal. Code Regs., tit. 18, § 8, subd. (c).) We conclude that neither the record nor public policy supports the assessor's theory that any reasonably prudent oil lease operator would postpone environmental cleanup to the last useful year of the lease. (Accord, *Inmar Associates, Inc.* v. *Borough of Carlstadt* (1988) 112 N.J. 593, 607-608 [549 A.2d 38, 45] [cost of environmental compliance "might prudently be spread out by 'competent management' over a number of years"].) The trial court properly set aside the assessment on the ground the assessor's method of valuation is arbitrary, in excess of discretion, and contrary to standards prescribed by law. Dominguez's actual environmental cleanup expenses paid as a result of environmental constraints applied to the use of land pursuant to statutes must be considered by the assessor for the year paid, not arbitrarily reallocated to the final useful year of the lease.

## DISPOSITION

The judgment is affirmed.

Hastings, J., and Baron, J., concurred.