[No. B146471. Second Dist., Div. Six. Oct. 22, 2001.]

EXXON MOBIL CORPORATION, Plaintiff and Respondent, v.
COUNTY OF SANTA BARBARA et al., Defendants and Appellants.

## COUNSEL

Stephen Shane Starke, County Counsel, Craig A. Smith, Deputy County Counsel; and Brett L. Price for Defendants and Appellants.

Rodi, Pollock, Pettker, Galbraith & Cahill, C. Stephen Davis, Cris K. O'Neall; Archbald & Spray and Douglas B. Large for Plaintiff and Respondent.

## OPINION

**YEGAN, J.**—In this tax refund case, Exxon Mobil Corporation (Exxon) challenges the method by which the county assessor and county assessment appeals board valued its oil processing facility for the 1993-1996 tax years. (Rev. & Tax. Code, § 5140 et seq.)[1] The trial court found that the Santa Barbara County Assessment Appeals Board (Board) used the wrong valuation methodology and remanded the matter for further proceedings. County of Santa Barbara (County) appeals. We affirm.

### Facts and Procedural History

Exxon owns and operates the Santa Ynez Unit (SYU). It consists of 76,200 acres of offshore oil and gas leaseholds in federal waters off the coast

---

[1]Unless otherwise stated, all statutory references are to the Revenue and Taxation Code.

of Santa Barbara County. The SYU includes production platforms, pipelines, and oil transmission and processing facilities. Crude oil and natural gas are transmitted to Exxon's Las Flores Canyon facility (LFC), an onshore oil processing facility. There, crude oil is separated from the oil-water emulsion and sold to refineries. Natural gas is also extracted from the oil-water emulsion to power a 45-megawatt cogeneration facility which provides electricity to the SYU onshore and offshore facilities. Some of the natural gas is sold to Pacific Offshore Pipeline Company (POPCO) and processed elsewhere. POPCO is not owned by Exxon.

During the nine years that it took to construct the LFC, oil prices dropped significantly. On March 1, 1993, the lien date for the 1993-1994 tax year, the LFC was assessed as new construction in progress. The LFC was completed several months later and received its first crude oil in December 1993. Because of the drop in oil prices, Exxon determined that it would not recover its original investment and would lose approximately $1.2 billion over the lifetime of the SYU project.

The assessor contended that the fair market value of the LFC was equal to its cost of construction. Exxon claimed that the LFC was an integrated component part of the SYU and that the LFC and SYU should be appraised as a single unit. Because the decline in oil prices affected the value of the SYU, Exxon claimed that the value of the LFC was less than its construction cost. In the alternative, Exxon argued that if cost of construction was used to determine fair market value, more than $500 million in deductions should be made for economic obsolescence based on the decline in oil prices and the cost of abandoning the LFC pursuant to the conditions in its county permit.

Although Exxon and the assessor agreed that the historical cost of the LFC was $570 million, the assessor made no deductions for economic obsolescence. Exxon paid the property taxes and filed an application with the Board for reduction of tax assessments for the 1993-1996 tax years.

After 28 days of testimony, the Board found that the assessor did not err in classifying the LFC as the appraisal unit or in using a cost approach to determine its value. The Board found that State Board of Equalization Rule 468 (SBE Rule 468; Cal. Code Regs., tit. 18, § 468), which proscribes the valuation methodology for oil and gas mineral reserves, did not apply because the LFC was an offsite oil processing facility and had no oil or mineral reserves.

The Board accepted Exxon's contention that declining oil prices affected the value of the property but devised its own method of quantifying economic obsolescence. The Board found that the 1993-1994 base year value of

the LFC was approximately $644 million, $74 million more than the actual cost of construction. The increase in property taxes resulted in the levy of escape assessments and interest penalties.

On June 14, 1999, Exxon filed suit praying for an $18,018,725 tax refund and the recovery of $697,391.82 in escape assessments plus $222,929.31 interest (first cause of action). The second and third causes of action alleged that Exxon was not liable for interest accruing on additional taxes levied after the Board increased the assessed value of the LFC. (§ 4837.5, subd. (c).) By stipulation, the second and third causes of action were bifurcated and valuation was tried first.

The trial court ruled: "The correct unit of appraisal is . . . both the on-shore and the off-shore components of the subject property. The SYU and the LFC are one appraisal unit; they are functionally and economically integrated; neither can operate without the other." The trial court concluded that the Board erred in not using the valuation methodology set forth in SBE Rule 468 (Cal. Code Regs., tit. 18, § 468). Reserving jurisdiction, the court remanded the matter back to the Board to redetermine the value of the LFC for the lien dates in question.

### Appealable Order

Exxon argues that the order is not appealable because the matter was remanded for further proceedings. A judgment will not be entered until the Board redetermines value and the trial court reviews the Board's findings.

In determining whether the order is appealable, we adhere to the rule that it is the substance and effect of the order, not its label, that controls. (*Joyce v. Black* (1990) 217 Cal.App.3d 318, 321 [266 Cal.Rptr. 8]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2000) ¶ 2:38, p. 2-21.) "The policy of the law is to recognize a right to review the judgment of a lower court if not prohibited by law. The 'right of appeal is remedial, and in doubtful cases the doubt should be resolved in favor of the right whenever the substantial interests of a party are affected by a judgment.' [Citations.]" (*Koehn v. State Board of Equalization* (1958) 50 Cal.2d 432, 435 [326 P.2d 502].)

We hold that in tax refund cases, an order directing the assessment appeals board to apply a different valuation methodology and redetermine value is appealable. (E.g., *De Luz Homes, Inc. v. County of San Diego* (1955) 45 Cal.2d 546, 553 [290 P.2d 544] [remand order appealable even though trial court retained jurisdiction to review assessment appeal board proceedings

and make further orders]; *Mola Development Corp. v. Orange County Assessment Appeals Bd.* (2000) 80 Cal.App.4th 309, 315 [95 Cal.Rptr.2d 546]; *Dominguez Energy v. County of Los* Angeles (1997) 56 Cal.App.4th 839, 842 [65 Cal.Rptr.2d 766]; *Norby Lumber Co. v. County of Madera* (1988) 202 Cal.App.3d 1352, 1366 [249 Cal.Rptr. 646].) In *Kaiser Center, Inc. v. County of Alameda* (1987) 189 Cal.App.3d 978 [234 Cal.Rptr. 603], the trial court found that the wrong valuation methodology was used and remanded the matter to the assessment appeals board to redetermine the fair value of the property. Although the trial court retained jurisdiction to review the board proceedings, the Court of Appeal impliedly ruled that the order was final and appealable. (*Id.*, at p. 984.) We adhere to the result reached in *Kaiser,* and reject Exxon's argument that the appeal should be dismissed as premature.

### *Standard of Review*

■ "In reviewing [the Board's] valuation method we begin with the proposition that no property may escape taxation because of the difficulty of determining its full cash value. '[T]he absence of an "actual market" for a particular type of property does not mean that it has no value or that it may escape from the constitutional mandate that "all property . . . shall be taxed in proportion to its value" . . . .' [¶] [A]ssessors have developed three basic methods for determining full cash value: (1) the market data method [citations]; (2) the income method [citations]; and (3) the cost method [citations.]." (*Bret Harte Inn, Inc. v. City and County of San Francisco* (1976) 16 Cal.3d 14, 23-24 [127 Cal.Rptr. 154, 544 P.2d 1354].) "[S]ince no one of these methods alone can be used to estimate the value of all property, the assessor, subject to requirements of fairness and uniformity, may exercise his discretion in using one or more of them. [Citations.]" (*De Luz Homes Inc. v. County of San Diego, supra,* 45 Cal.2d at p. 564.) As we will explain, we concur with the trial court's implied rulings that 1. the Board's methodology was not uniform with State Board of Equalization rules, and 2. the cost method is here unfair.

■ County argues that the Board's decision, which uses a cost approach, must be affirmed if supported by substantial evidence. We disagree. Contentions that go to the valuation methodology, i.e., that the Board violated valuation standards prescribed by law, present a question of law subject to de novo review. (*Bret Harte Inn, Inc. v. City and County of San Francisco, supra,* 16 Cal.3d at p. 23; *Dominguez Energy v. County of Los Angeles, supra,* 56 Cal.App.4th 839, 852; *Service America Corp. v. County of San Diego* (1993) 15 Cal.App.4th 1232, 1235 [19 Cal.Rptr.2d 165].) Because Exxon's "attack is directed at the Board's method of valuation, . . . we and the trial court look to see whether, as a matter of law, the method was arbitrary, in

excess of discretion, or in violation of the standards prescribed by law. [Citation.] In this regard we look not to whether another approach might also have been valid or yielded a more precise reflection of the property's value, but whether the method chosen was contrary to law. [Citations.]" (*County of Orange v. Orange County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 524, 529-530 [16 Cal.Rptr.2d 695], fn. omitted.)

### The Appraisal Unit

██ The Board, in accordance with its constitutional and statutory duties, is required to assess the unit value of Exxon's property at its full value, i.e., "the price at which the property would transfer if exposed for sale on the open market between knowledgeable parties in equal bargaining positions. [Citations.]" (*Texaco Producing, Inc. v. County of Kern* (1998) 66 Cal.App.4th 1029, 1035 [78 Cal.Rptr.2d 433].) A threshold issue is whether the entire SYU, including the LFC, is a single appraisal unit. "An appraisal unit of property is a collection of assets that functions together, and that persons in the marketplace commonly buy and sell as a single unit or that is normally valued in the marketplace separately from other property, or that is specifically designated as such by law." (Cal. Code Regs., tit. 18, § 324, subd. (b); see also § 51, subd. (d) [assessor shall consider "that appraisal unit that persons in the marketplace commonly buy and sell as a unit, or that is normally valued separately."].)

The State Board of Equalization Assessors' Handbook section 502, Advanced Appraisal (Dec. 1998), is used as a basic guide by tax assessors.[2] It states: "Several factors may indicate that multiple parcels should be considered a single appraisal unit. These factors include: (1) the functional and economic integration of the parcels; (2) the attainment of highest and best use when the parcels are analyzed as a single unit; (3) contiguity; (4) common ownership; and, (5) current or prior combined sales of the parcels (i.e., actual transactions in which the parcels transferred as a unit). The final decision as to the appraisal unit is a matter of judgment, and no single factor can be considered controlling. The appraiser's determination of the proper appraisal unit should reflect the unit most likely to be sold in view of these five factors, if the property were exposed to the open market." (Handbook section 502, *supra*, at pp. 2-3.)

The trial court correctly ruled that the Board erred in treating the LFC as a separate appraisal unit. Because there is common ownership of the SYU

---

[2]The State Board of Equalization is authorized to prescribe rules, regulations, and instructions to promote uniform assessment practices. (Gov. Code, § 15606, subds. (c)-(g).) The State Board of Equalization Assessors' Handbooks have "been relied upon by the courts in interpreting valuation questions . . . and have been accorded 'great weight' in this regard. [Citation.]" (*Prudential Ins. Co. v. City and County of San Francisco* (1987) 191 Cal.App.3d 1142, 1155 [236 Cal.Rptr. 869].)

offshore and onshore components, and the components are physically connected by pipes and electrical lines, the SYU and LFC is a single integrated oil/gas production operation. The value of the LFC depends on oil and gas production from the SYU. The assessor's expert, Joseph Colosi, testified that the valuation problem was like a pair of gloves. "By itself one glove may be valueless, but together as a unit they have value. . . . [¶] . . . [¶] You know, you can argue that all the value is at Las Flores Canyon, because . . . [without] Las Flores Canyon, the [SYU] platforms would be severely diminished in value. Or conversely, one can argue that Las Flores Canyon is valueless without the platforms."

The administrative record indicated that no oil producing facility had been sold separately where there was common ownership of the facility and oil reserves in an integrated oil production operation. In an April 12, 1994 memorandum, J. P. Meehan of the assessor's audit division acknowledged that the offshore and onshore SYU units would have to be valued "as a whole . . . . Surely, the Project would not be marketed/sold on a piecemeal basis especially since most accounting and appraisal theory indicates that the support facilities are dependent on the value of the reserves in the field!"[3]

County argues that the SYU and LFC are separate appraisal units because the LFC theoretically can be used to treat crude oil from other oil reserves. County may be correct in theory. But in reality, County is wrong. The SYU final development plan, approved by County for the construction of the LFC, provides that the LFC may only be used for the storage and processing of oil and gas produced from the SYU. The permit restrictions render the offshore and onshore components functionally integrated and prevent the LFC from being sold as a stand-alone oil processing facility. "There is a rebuttable presumption that restrictions will not be removed or substantially modified in the predictable future and that they will substantially equate the value of the land to the value attributable to the legally permissible use or uses." (§ 402.1, subd. (b); e.g., *Borel v. County of Contra Costa* (1990) 220

[3]County claims that two onshore oil producing facilities were sold separate and apart from their offshore oil reserves: the Exxon Carpinteria/Summerland Facility and the HS&P/Point Pedernales Facility. The Exxon Carpinteria/Summerland sale was not an arm's-length sale. Exxon sued its partner, Chevron, to purchase its interest in the onshore facility after Exxon withdrew from the offshore operation. The record indicates that the HS&P/Point Pedernales sale was by common owners who sold the offshore reserves and the onshore facility as a single unit.

The Board found a lack of evidence of comparable sales and rejected "arguments by the Assessor that the transactions involving the Point Pedernales property or the Carpinteria property necessarily show that these properties typically are not transferred as units, the evidence was merely insufficient to show that these properties typically do sell together as one unit." Having rejected the market data/comparable sales approach, the Board was left with an income approach or cost approach to value the LFC.

Cal.App.3d 521, 525-527 [269 Cal.Rptr. 460] [rebuttable presumption that agricultural zoning was permanent]; *Dominguez Energy v. County of Los Angeles, supra,* 56 Cal.App.4th at p. 853 [§ 402.1 presumption reduced tax on land undergoing environmental remediation].)

When considered in the context of the SYU final development plan and permit restrictions, the SYU and LFC must be valued as a single appraisal unit. They function together in a state of symbiosis. Where the County places restrictions on the use of property which significantly diminishes its economic viability, it may not impose a tax based upon a valuation of the property without regard to the restrictions.

### SBE Rule 468

The trial court ruled that the Board erred in not applying the valuation methodology set forth in SBE Rule 468 (Cal. Code Regs., tit. 18, § 468). SBE Rule 468, subdivision (c) states in pertinent part: "The unique nature of oil and gas property interests requires the application of specialized appraisal techniques designed to satisfy the requirements of Article XIII, Section 1, and Article XIII A, Section 2, of the California Constitution. To this end, the valuation of such properties and other real property associated therewith shall be pursuant to the following principles and procedures. . ." (Cal. Code Regs., tit. 18, § 468, sub. (c).) SBE Rule 468 was "promulgated by the State Board of Equalization . . . in the wake of Proposition 13, [to establish] valuation principles for the taxation of oil and gas interests." (*Phillips Petroleum Co. v. County of Lake* (1993) 15 Cal.App.4th 180, 189 [18 Cal.Rptr.2d 765].) It uses an "[appraisal] unit [valuation consisting] of four components: proved reserves; wells, casings, and parts thereof; land (other than mineral interests); and improvements." (*Id.,* at p. 191.) SBE Rule 468, subdivision (c)(6), provides: "Value declines shall be recognized when the market value of the appraisal unit, i.e., land, improvements and reserves, is less than the current taxable value base of the same unit." (Cal. Code Regs., tit. 18, § 468, subd. (c)(6).)

SBE Rule 468 controls because integrated oil and gas production facilities are not like other types of real property. (*Lynch v. State Bd. of Equalization* (1985) 164 Cal.App.3d 94, 114-115 [210 Cal.Rptr. 335].) SBE Rule 1 requires that assessors and assessment appeals boards apply SBE Rule 468 to ensure statewide uniformity in appraisal practices. (Cal. Code Regs., tit. 18, § 1; e.g., *Main & Von Karman Associates v. County of Orange* (1994) 23 Cal.App.4th 337, 342-343 [28 Cal.Rptr.2d 432].) The Board may not circumvent the SBE rules by using a "shortcut method" to value the LFC. (*Main & Von Karman Associates, supra,* 23 Cal.App.4th at p. 343.)

County argues that the Board has the discretion to divide the SYU into its component parts and use a different valuation methodology to calculate the fair value of the LFC. County's reliance on *County of Orange v. Orange County Assessment Appeals Bd., supra,* 13 Cal.App.4th 524 is misplaced. There different valuation methods were used to assess a cable television system for tax purposes. An income method was used to value the cable television company's possessory interest in public property, and a cost replacement method was used to value the fixtures, equipment, and personal property. The valuation was based on section 107.7 which provides for special valuation rules for cable television systems. (*County of Orange, supra,* 13 Cal.App.4th at p. 536.)

Due to the unique nature of oil and gas property interests, specialized appraisal techniques are required here. (*Dominguez Energy v. County of Los Angeles, supra,* 56 Cal.App.4th at p. 845.) In assessing oil and gas properties, the value of oil production equipment is tied to the value of the mineral reserves it services. (Cal. Code Regs., tit. 18, § 468, subd. (c)(5), (6); State Bd. Equalization Assessors' Handbook section 566, Assessment of Petroleum Properties (Aug. 1996) pp. 7-1 to 7-2.) "[P]etroleum properties are valued as a unit" and dewatering and oil separation facilities are part of the oil and gas appraisal unit. (*Id.,* § 566, pp. 7-1 to 7-2.) Here, the Board found that "the sole function of the LFC is to process oil and other petroleum products" and that "its value is therefore affected by changes in oil prices." It was uncontroverted that the SYU Final Development Plan only allowed the LFC to service the oil and gas produced from the SYU.

James McCarthy, a State Board of Equalization senior petroleum and mining appraisal engineer, is the principal author of the Assessors' Handbook section 566, Assessment of Petroleum Properties and the Assessors' Handbook section 560, Appraisal of Mining Properties. McCarthy testified that SBE Rule 468 governs the assessment of "all components such as a petroleum treatment plant, waste water treatment facilities and related improvements necessary to extract petroleum and ship it to a sales point. Whether oil and gas reserves are located directly beneath a particular improvement or piece of equipment is irrelevant."

County contends that the trial court erred in considering McCarthy's declaration because it was not before the Board. The argument is without merit. Where the taxpayer challenges the valuation method used, the trial court "may take evidence on the validity of the method, and may overturn the assessment if the challenged method of valuation is arbitrary, in excess of discretion, or in violation of standards prescribed by law. [Citation.]" (*Dominguez Energy v. County of Los Angeles, supra,* 56 Cal.App.4th at

p. 852.) Here the trial court was not restricted to the administrative record and properly received additional evidence as needed. (*Union Pacific Railroad Co. v. State Bd. of Equalization* (1991) 231 Cal.App.3d 983, 992 [282 Cal.Rptr. 745]; *Trailer Train Co. v. State Bd. of Equalization* (1986) 180 Cal.App.3d 565, 582 [225 Cal.Rptr. 717]; *Georgia-Pacific Corp. v. County of Butte* (1974) 37 Cal.App.3d 461, 474 [112 Cal.Rptr. 327].)

As a senior petroleum and mining appraisal engineer for the State Board of Equalization, McCarthy supervised statewide compliance of SBE Rule 468. He stated that the opinions expressed in his declaration "represent a consensus view of the SBE staff responsible for the enforcement and interpretation of Rule 468 . . . ." McCarthy opined that "the SYU and LFC are one appraisal unit. They are functionally and economically integrated; the parcels may operate only as a single unit; and the onshore and offshore facilities are owned by the same person. There is contiguity because the LFC is physically connected to the offshore assets by means of pipelines and electrical cables . . . . The principal factor demonstrating to me that the LFC is part of the SYU is the fact that the LFC and SYU are functionally integrated, and that neither can operate without the other. Functional integration of an oil treatment plant with the oil and gas reserves being serviced by the plaintiff is typical. I am unaware of any circumstance in which an operating oil treatment plant is assessed, or which has been sold, separately from the minerals it treats."

The trial court credited McCarthy's declaration, and for good reason: The interpretations and opinions of an agency administrator, while not controlling upon the courts, constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 14 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) "[B]ecause the agency will often be interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues. It is this 'expertise,' expressed as an interpretation (whether in a regulation or less formally, as in the case of the Board's tax annotations), that is the source of the presumptive value of the agency's views." (*Id.,* at p. 11.)

### Conclusion

We conclude that the SYU and LFC constitute one appraisal unit that is governed by the valuation methods set forth in SBE Rule 468. Because the production of oil and gas is essentially an extraction process rather than a construction process, County's reliance on a cost of reproduction method of assessment is unavailing. (*Lynch v. State Bd. of Equalization, supra,* 164

Cal.App.3d 94, 107.) The valuation methodology adopted by the Board "wholly abandons any attempt to achieve a reasonable estimate of the true present value of the property to which it addresses itself. It is for this reason invalid." (*Bret Harte Inn, Inc. v. City and County of San Francisco, supra,* 16 Cal.3d at p. 27, fn. omitted.)

The judgment (order remanding matter to Board for further proceedings) is affirmed. Exxon is awarded costs on appeal.

Gilbert, P. J., and Coffee, J., concurred.

On November 19, 2001, the opinion was modified to read as printed above.