Opinion
 

 RAMIREZ, P. J.
 

 After his first trial resulted in a hung jury, James Newman Hood was convicted, following a second trial, of first degree murder (Pen. Code, § 187), during which he used a handgun (Pen. Code, § 12022.5, subd. (a)). He was sentenced to prison for four years, plus twenty-five years to life, and appeals, claiming evidence was improperly admitted, the prosecutor committed misconduct during argument to the jury, and his new trial motion should have been granted. We reject his contentions and affirm.
 

 Facts
 
 [1]
 

 Hood and his business partner owned and managed, inter alia, an office complex in Bloomington. The victim had worked for Hood as a construction worker and foreperson. During his employment, the victim had been charged with killing Hood’s wife in Tulare County. He was tried for the crime and acquitted in 1990. In January 1992, the victim and a cohort burglarized two of the offices at the complex, taking valuable construction equipment. They then attempted to extract money from Hood and his partner for the return of the equipment. The cohort was eventually arrested for his participation in the offense, and the police were eager to speak to the victim about his activities.
 

 On March 2, 1992, the victim, after having spoken by phone with Hood, entered the management office at the complex, greeted Hood’s secretary and entered Hood’s private office. Within a very short period of time, Hood fired seven bullets into the victim, killing him. The prosecutor contended that the killing was deliberate and premeditated; the defense contended that the victim had threatened Hood beforehand and was in the process of pulling out a gun when Hood shot him in self-defense.
 

 
 *968
 
 Issues and Discussion
 

 1.
 
 Admission of Evidence
 

 a.
 
 The Prosecution’s Computer Animation
 

 Before the first trial, the prosecution moved to be permitted to introduce a computer animation of the shooting, based upon information supplied by Hood’s secretary and the detective who did measurements at the scene and on the reports and opinions of the pathologist who performed the autopsy on the victim and prosecution ballistics and gunshot residue experts. Hood opposed admission of the animation, claiming, inter alia, that, under the
 
 Kelly
 

 [2]
 

 formulation
 
 (People
 
 v.
 
 Leahy
 
 (1994) 8 Cal.4th 587 [34 Cal.Rptr.2d 663, 882 P.2d 321]), computer animation had not gained the scientific acceptance necessary for admissibility. The trial court ruled that the animation was illustrative, similar to an expert who draws on a board, and was not being introduced as evidence in and of itself, but only to illustrate the testimony of various prosecution experts.
 

 Both the prosecution and the defense introduced computer animations of the shooting at the first trial. However, the defense later concluded that its animation was not as accurate as it could be and, therefore, it prepared a new one for the second trial. Before the second trial began, Hood again objected to the prosecution’s animation on the basis of foundation; however, the trial court overruled the objection, finding that both the prosecution’s and the defense’s animations had adequate foundations.
 
 [3]
 

 Before the prosecution’s computer animation was played for the jury, the trial court gave the jury the following instruction: “. . . [Y]ou’re reminded that . . . this is an animation based on a compilation of a lot of different experts’ opinions. And there are what we call crime scene reconstruction experts who could, without using a computer, get on the stand and testify that based on this piece of evidence and this piece of evidence and this piece of evidence that they’ve concluded that the crime occurred in a certain manner. And then they can describe to you the manner in which it occurred. And they can sometimes use charts or diagrams or re-create photographs to demonstrate that. And the computer animation that we have here is nothing more than that kind of an expert opinion being demonstrated or illustrated by the computer animation, as opposed to charts and diagrams.” While Hood was on the stand, the trial court further instructed the jury as to the computer animations presented by the prosecution and defense: “I . . . again remind
 
 *969
 
 you that all of the animated video reenactments or re-creations are only designed to be an aid to testimony or reconstruction, the same as if an expert testified and drew certain diagrams on the board. They are not intended to be a film of what actually occurred or an exact re-creation. And, therefore, there may be things in each of the videos—in fact, you’ve heard from some of the witnesses [that] in each of the videos[,]. . . there are things that are not exactly accurate or not exactly as they occurred, but reasonably close, and it’s important to keep that in mind with regard to all of the animated videos, that they are not actual films of what occurred nor are they intended to be exact, detailed replications of every detail or every event or every movement. They are only an aid to giving an overall view of a particular version of the events, based on particular viewpoints or particular interpretations of the evidence.”
 

 Hood here begins his attack on the admission of the prosecution’s computer animation, reiterating the point he made before the first trial that it did not meet the requirements of the
 
 Kelly
 
 formulation. We agree with the trial court that it did not need to do so. The
 
 Kelly
 
 formulation applies to “new scientific procedures”
 
 (People
 
 v.
 
 Bury
 
 (1996) 41 Cal.App.4th 1194, 1202 [49 Cal.Rptr.2d 107]) or “a new scientific technique . . . [or] [¶ . . . novel method of proof.”
 
 (People
 
 v.
 
 Kelly, supra,
 
 17 Cal.3d at p. 30.) The
 
 Kelly
 
 formula exists to prevent “[l]ay jurors [from] tending] to give considerable weight to ‘scientific’ evidence when presented by ‘experts’ with impressive credentials. We have acknowledged the existence of a ‘. . . misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.’ [Citation.] . . . ‘[Scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury . . . .’ [Citation.]”
 
 (Id.
 
 at pp. 31-32.)
 

 The scientific procedures and techniques envisioned in
 
 Kelly
 
 and the dangers addressed therein were not involved here. The prosecution and defense computer animations were tantamount to drawings by the experts from both sides to illustrate their testimony. We view them as a mechanized version of what a human animator does when he or she draws each frame of activity, based upon information supplied by experts, then fans through the frames, making the characters drawn appear to be moving. If the animations here had been done by hand, rather than by a computer, there would have been no
 
 Kelly
 
 issue as to the work done by the animators.
 
 [4]
 
 By the same token, there was no
 
 Kelly
 
 issue as to the functioning of the computer in creating the animations. Given the nature of the testimony at trial as to how
 
 *970
 
 the prosecution’s animation had been prepared, the introduction of the defense’s contradictory animation and the instructions given the jury concerning both animations, there was no danger that the jury was swept away by the presentation of a new scientific technique which it could not understand and, therefore, would not challenge. As the People correctly point out, Hood cites no authority for applying the
 
 Kelly
 
 formula to computer animation.
 

 Next, Hood contends that the prosecution’s animation was based on “a number of factors, including the reactions and stats [sic] of mind of two people under conditions of extreme stress, for which there simply was no clear evidence. [The computer expert who prepared the prosecution’s animation] cumulated assumptions (styled as ‘expert’ inferences) together to create an overall scenario that became remote from the necessary evidentiary foundation. [¶ Even the prosecution witnesses admitted other explanations of the proven facts were possible. ... [¶ This re-enactment was also based on inadmissible speculation regarding the position and posture of [the victim] at the time of the shots. ... [¶.. . [T]he resulting construct improperly sought to demonstrate [Hood]’s purported intent by portraying his actions in conformity with the prosecution’s mental state theory.” Unfortunately, Hood asserted none of these grounds below, and, therefore, waived them.
 
 [5]
 
 (Evid. Code, § 353.)
 

 Hood contends that admission of the prosecution’s animation invaded the province of the jury in that it constituted an expert statement of how the killing occurred, which was for the jury to determine. As with Hood’s objections just discussed, he failed to object below on this ground and is therefore prohibited from doing so now. Moreover, the defense’s animation was no less an expert statement of how the killing occurred.
 

 
 *971
 
 Next, Hood faults the prosecutor for certain remarks he made concerning the People’s computer animation. First, he points out that the prosecutor solicited testimony from the computer expert who prepared the animation that besides showing it to a detective who had taken measurements at the scene and certain prosecution experts, all of whom later testified at trial, he also showed it to “[p]eople in the detective’s bureau at the sheriff’s department . . . [¶ to determine whether it was accurate in their opinion . . . .” However, Hood failed to object to this testimony; therefore he cannot now complain about it. (Evid. Code, § 353.)
 

 Hood also cries foul over the following colloquy between the prosecutor and his computer expert:
 

 “Q [by the prosecutor:] And I specifically asked you not to put in[to the animation] any figures about Mr. Hood, didn’t I?
 

 “A [by the computer expert:] That’s true.
 

 “Q [by the prosecutor:] I just wanted to show what we know from the evidence about [the victim’s] actions, but I did not ask you to put in anybody—”
 

 Defense counsel unsuccessfully objected below to the prosecutor’s reference to “what we know” on the basis that what the prosecution knew did not include Hood’s version of the shooting. This is not adequate to preserve Hood’s current objection on the ground that the prosecutor was personally vouching for the animation.
 
 [6]
 

 Finally, Hood contends that the trial court abused its discretion in determining that the probative value of the prosecution’s computer animation outweighed its prejudicial impact. Aside from reiterating the points
 
 *972
 
 made and rejected below, Hood asserts that the animation was emotionally charged and preyed on the emotions of the jury. We disagree. The animation was clinical and emotionless. This, combined with the instruction given the jurors about how they were to utilize both animations, persuades us that the trial court did not abuse its discretion in this regard.
 

 b., c.
 
 *
 

 2., 3.
 
 *
 

 Disposition
 

 The judgment is affirmed.
 

 Hollenhorst, J., and Richli, J., concurred.
 

 A petition for a rehearing was denied April 18, 1997, and appellant’s petition for review by the Supreme Court was denied July 16, 1997.
 

 [1]
 

 We have read the extensive reporter’s transcript in this case. This permits us to draw our own conclusions about the correctness of the People’s assertion that appellate counsel for Hood has misrepresented the record in his opening brief. Naturally, any attorney who misrepresents the record to this court runs the risk of diminishing his or her credibility.
 

 [2]
 

 People
 
 v.
 
 Kelly
 
 (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240].
 

 [3]
 

 Defense counsel agreed with the trial court.
 

 [4]
 

 Of course, the experts who supplied the information all testified at trial and were extensively cross-examined by the defense and certain portions of their testimony were additionally challenged by contrary evidence offered by Hood.
 

 [5]
 

 Below, Hood asserted only once that the prosecution’s animation was based on speculation. Before the first trial began, at a hearing on the admissibility of the animation, defense counsel contended that there was no evidentiary basis for the animation’s depiction of how the victim entered Hood’s private office. However, the prosecution pointed to evidence which demonstrated such a basis. Defense counsel also claimed that there was no evidentiary basis for the animation’s view of the occurrences from above. (The defense computer animation introduced at the second trial, however, showed its own version of the shooting, also from above.) He further asserted that the depiction of the victim’s right hand at some point while he was in Hood’s private office was contrary to the evidence presented at the preliminary hearing. Finally, he claimed that there was no testimony at the preliminary hearing that the victim’s body had been moved, as depicted in the animation. The trial court ruled, as to these latter objections, “[I]t has to sort of be [admitted] on. . . faith that the rest of your witnesses are going to say . . . that the video does conform to the facts, ... as they understand them, that there’s nothing inconsistent about the video and what they observed.” Apparently, this came to pass at the first trial because, although objecting again to the admission of the prosecution’s animation before the second trial began, defense counsel conceded that it had an adequate foundation. (See fn. 3,
 
 ante.)
 
 These objections were as close as defense counsel came to challenging the admissibility of the animation on the bases now asserted.
 

 [6]
 

 Hood also calls our attention to a remark made by the prosecutor during argument to the jury. He said, “One of the reasons that I kept going over to the lab and meeting with the doctors and talking with the various witnesses involved who were experts, ... [is because] I was trained as a doubter. You know, Descarte[s] taught me to doubt, so I wanted to see for myself what these experiments really did for us. What did they really tell us? How valid were they? What does it mean? And so because of my own ignorance about a lot of these areas, I went over there to do that. I don’t think any of you think that everybody got together here and tried to railroad Mr. Hood. I think, on the contrary, everybody was very cautious in terms of trying to decide what in fact really do we have here. And all my questions of the experts were designed to say, what do we really have here[?] And that’s why we went over and did that kind of thing, is to try to learn.” Contrary to Hood’s present assertion, this was not an instance of the prosecutor’s vouching for the People’s computer animation. It was in response to a suggestion by the defense that Hood had been railroaded. More importantly, it was not objected to at trial, and therefore cannot be examined on this appeal. (Evid. Code, § 353.)
 

 *
 

 See footnote,
 
 ante,
 
 page 965.