[No. F023931. Fifth Dist. Aug. 28, 1998.]

TEXACO PRODUCING, INC., et al., Plaintiffs and Appellants, v.
COUNTY OF KERN, Defendant and Respondent.

1030

## COUNSEL

Arrache, Clark & Potter and Thomas S. Clark for Plaintiffs and Appellants.

Brett L. Price for Defendant and Respondent.

## OPINION

LEVY, J.—This appeal concerns the assessment of oil producing property owned and operated by appellant, Texaco Producing, Inc. (Texaco), for the years 1984, 1985 and 1986. In an attempt to overcome the presumption that ad valorem property tax assessments are correct, Texaco challenges the legality of appraisal methods used by the Kern County Assessor (Assessor). Texaco further argues the appraised values are not supported by substantial evidence. However, Texaco has failed to meet its burden of demonstrating error. Thus, the assessments must be upheld.

### STATEMENT OF THE CASE

In February 1984, Getty Oil Company (Getty) was merged into Texaco through Texaco's purchase of Getty's stock. Texaco's acquisition of Getty triggered a reassessment of the real property interests previously owned by

Getty as a change of ownership under Proposition 13. (Cal. Const., art. XIII A; Rev. & Tax. Code, § 64.[1]) This property transfer included fee holdings and leasehold interests in over 5,830 acres located in an oil producing area known as the Kern River Oilfield (Kern River).

The Assessor reappraised this Kern River property as of the March 1, 1984, lien date to establish a new base-year value. Thereafter, the Assessor made and enrolled annual assessments.

Texaco timely filed applications for changed assessment with the Kern County Assessment Appeals Board (Board) contesting the values established for the March 1, 1985, and March 1, 1986, lien dates. Texaco also contested the valuation and assessment for the base valuation year 1984/1985. The Board conducted 129 days of hearings on these applications between November 28, 1988, and June 4, 1990. On December 27, 1990, the Board issued its final statement of decision finding in favor of the Assessor "based on the substantial evidence presented at the hearing of this matter and a determination of the relative credibility of the witnesses."

The Board determined the full value of Texaco's holdings to be as follows:

| | |
|---|---|
| 1984/1985 | $2,547,731,543 |
| 1985/1986 | $2,154,440,247 |
| 1986/1987 | $1,680,979,046 |

In contrast, Texaco argued the holdings should be assessed for these tax years at $1,325,000,000, $1,212,000,000, and $611 million respectively.

Texaco filed a complaint in the superior court seeking recovery of ad valorem taxes paid for the tax years 1985-1986 and 1986-1987. Texaco claimed it was entitled to refunds of approximately $8.4 million for 1985-1986 and approximately $10.7 million for 1986-1987. Texaco further sought a declaration that the method used by the Assessor to appraise the Kern River property for the 1984-1985, 1985-1986, and 1986-1987 tax years was unconstitutional, illegal and improper. Texaco also claimed the Board erred, as a matter of law, in relying on "a totally unique, unfounded, untested, illegal, invalid and improper method of appraisal" and therefore abused its discretion, conducted itself in an arbitrary and capricious manner, and

---

[1] All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

ultimately issued an opinion which was not supported by substantial evidence.

The trial court denied relief to Texaco and entered judgment in favor of respondent, County of Kern (County). The court found the methods used by the Assessor to determine the roll value of the Kern River property were "constitutionally and legally valid and proper." The court further held the Board did not abuse or exceed its discretion, properly followed applicable standards of law, and issued a decision supported by substantial evidence.

## STATEMENT OF FACTS

Kern River is an area of approximately 9,960 acres which has been producing heavy oil since the late 19th century. This property has been intensely researched and developed. The systems and techniques employed are considered to be " 'state of the art' " and significant potential exists for additional development. Kern River has large gross proven reserves, an extensive production history, and a developed infrastructure for extraction, storage, and transportation. Consequently, the field is of above average quality and the risks associated with its operation are reasonably low.

In sum, Kern River is a very desirable property. It is against this background that the various methods which were used to value Texaco's interests in the property must be examined.

Property subject to general property taxation is assessed at its full value, i.e., the price at which the property would transfer if exposed for sale on the open market between knowledgeable parties in equal bargaining positions. (§§ 110 and 401; Cal. Code Regs., tit. 18, § 2.) State Board of Equalization rules 2 through 8 (Cal. Code Regs., tit. 18, §§ 2-8),[2] set forth various approaches the assessor is to use in estimating this full value. Two of these basic methods were applied by the Assessor's experts here, the comparable sales approach (rule 4), and the income approach (rule 8).

When market data is available, the preferred method of valuing real property is by reference to sales prices of comparable properties. (Rule 4.) However, due to the unique nature of oil and gas property interests, specialized appraisal techniques are required. Thus, a modified capitalization of income approach is the most commonly accepted valuation method. (*Lynch v. State Bd. of Equalization* (1985) 164 Cal.App.3d 94, 103-104 [210 Cal.Rptr. 335]; *Dominguez Energy* v. *County of Los Angeles* (1997) 56 Cal.App.4th 839, 845 [65 Cal.Rptr.2d 766]; rule 468.)

---

[2]The applicable California Code of Regulations, title 18, sections will hereafter be referred to as rules.

Here, in valuing the Kern River property, the Board determined the income approach was the preferred and more accurate method. The Board stated it arrived at this conclusion because "the intrinsic value of oil producing property stripped of unrelated surface improvements is the value of income that can be reasonably anticipated to be derived from the property over its economic life." However, the Board also used and considered "the factors and value conclusions resulting from the Assessor's comparable sales approach appraisals for the purpose of comparing, verifying, and establishing the validity and accuracy" of the income approach components and value conclusions. The Board specifically rejected Texaco's contention that the only appropriate or allowable valuation method was the income approach. Consequently, for purposes of this appeal, it is necessary to examine both methodologies.

## A. Oil and Gas Appraisals

One concept which underlies all oil and gas property appraisals is "proved reserves." This notion, which is unique to oil and gas properties, is an integral component of such appraisals. In fact, the State Board of Equalization rules require that the market value of an oil and gas mineral property interest be "determined by estimating the value of the volumes of proved reserves." (Rule 468, subd. (b).)

"Proved reserves" are defined as the volumes of crude oil and natural gas "which geological and engineering information indicate with reasonable certainty to be recoverable in the future, taking into account reasonably projected physical and economic operating conditions." (Rule 468, subd. (b).) They do not include "probable" or "possible" reserves. Further, "proved reserves" are not synonymous with amounts of oil known to be recoverable under existing technology. Rather, recoverable oil and gas will be included within proved reserves only if an augmented recovery program is economically justified. (*Lynch* v. *State Bd. of Equalization, supra,* 164 Cal.App.3d at pp. 104-105.)

### 1. The income approach to value.

The State Board of Equalization's general rule on the income approach to value states, "Using the income approach, an appraiser values an income property by computing the present worth of a future income stream. This present worth depends upon the size, shape, and duration of the estimated stream and upon the capitalization rate at which future income is discounted to its present worth. . . ." (Rule 8, subd. (b).) This method rests upon the assumption that in an open market a willing buyer of the property would pay

a willing seller an amount approximately equal to the present value of the future income to be derived from the property. (*Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 24 [127 Cal.Rptr. 154, 544 P.2d 1354].)

The process of converting an income stream into a stated value is known as capitalizing. Thus, this appraisal technique is also called the capitalization method. (*Freeport-McMoran Resource Partners* v. *County of Lake* (1993) 12 Cal.App.4th 634, 642 [16 Cal.Rptr.2d 428].) " 'The assessor capitalizes "the sum of anticipated future installments of net income from the property, less an allowance for interest and the risk of partial or no receipt." [Citation.]' " (*Ibid.*) The discount factor or capitalization rate which is applied reflects interest, the risk of no return or a lesser return of income, liquidity, investment management, taxes, and depreciation, where appropriate. (2 Ehrman & Flavin, Taxing Cal. Property (3d ed. 1997) General Valuation Principles, § 17:19, pp. 44-46.) Thus, a high-risk investment carries a proportionately higher capitalization rate.

In the context of valuing oil and gas producing property, the appraiser first estimates the proved reserves. The appraiser then determines the expected schedule of future production from those reserves and estimates the future gross income. The next step is to subtract the estimated costs of such production to arrive at the future net income. The final step is to discount this future net income to reduce it to present value. This final figure is considered the taxable value of the oil and gas interest. (*Lynch* v. *State Bd. of Equalization, supra,* 164 Cal.App.3d at p. 105; 2 Ehrman & Flavin, *supra,* Oil and Gas Properties, § 21:01, pp. 1-4.) Although appearing straightforward, each of these steps is very complex and involves many technical determinations and estimates. (2 Ehrman & Flavin, *supra.*)

Here, with respect to Kern River, the parties are in agreement on the figures derived from the above steps with one exception. The parties strongly disagree on the correct capitalization rate to apply to the estimated future net income.

Rule 8, subdivision (g), sets forth the two means by which the capitalization rate may be developed. The preferred method is to derive the rate from the market by "comparing the net incomes that could reasonably have been anticipated from recently sold comparable properties with their sales prices, adjusted, if necessary, to cash equivalents . . . ." (Rule 8, subd. (g)(1).)

To determine this market-derived rate, the appraiser first selects other sales which are sufficiently similar to the subject property for comparison.

The appraiser then extracts the discount rate from those sales by comparing the buyer's net cash flow projection to the price the buyer paid for the property. After these discount rates have been calculated, the appraiser must manipulate the range of rates in some manner in order to reach a conclusion regarding the appropriate discount rate for the subject property. Thus, widely different conclusions on an appropriate discount rate are possible depending on which sales the appraiser considers to be "comparable" and what adjustments the appraiser makes to the extracted discount rates.

A second way to develop a discount rate is by "deriving a weighted average of the capitalization rates for debt and for equity capital appropriate to the California money markets . . . ." This is known as the "band-of-investment" method. It requires the appraiser to "weight the rates for debt and equity capital by the respective amounts of such capital he deems most likely to be employed by prospective purchasers." (Rule 8, subd. (g)(2).) This method is based on the premise that the yield rate is the weighted average of the return on the different portions of the investment, i.e., debt and equity. (2 Ehrman & Flavin, *supra*, General Valuation Principles, § 17:19, pp. 44-46.)

The first step in performing a band-of-investment analysis is to determine the percentage of debt that would be appropriate for the specific property. The percentage remaining after subtracting this debt from 100 is the equity. The debt percentage is then multiplied by the cost of the debt, i.e., the mortgage rate, and the equity percentage is multiplied by the expected rate of return for this investment. Adding these two figures together provides an overall indication of the discount rate. The cost of the debt is readily determined from the relevant mortgage rates. However, the expected rate of return on the equity is much more difficult to determine and, as is the case here, is often a source of disagreement. (2 Ehrman & Flavin, *supra*, General Valuation Principles, § 17:19, pp. 44-46.)

2. *The comparable sales approach to value.*

When reliable market data is available, the preferred approach is for the assessor to value the subject property by reference to sales prices of comparable properties. (Rule 4.) Section 402.5 provides that, in order to be considered comparable, the sales must be sufficiently near in time to the valuation date, be located sufficiently near the subject property, and be sufficiently alike with respect to character, size, situation, and usability, so as to make it clear that the properties sold and the properties being valued are comparable in value. In other words, the assessor is to examine sales that may shed light on the value of the subject property. (*Midstate Theatres, Inc.* v. *County of Stanislaus* (1976) 55 Cal.App.3d 864, 880 [128 Cal.Rptr. 54].)

However, the assessor is obligated to make adjustments to the raw data as mandated by the California Code of Regulations to ensure that there is statewide uniformity in appraisal practices and that the subject property is assessed at its full value. (*Main & Von Karman Associates* v. *County of Orange* (1994) 23 Cal.App.4th 337, 342-343 [28 Cal.Rptr.2d 432].) Therefore, the assessor must "Make such allowances as he deems appropriate for differences . . . in physical attributes . . . , location . . . and the income and amenities which the properties are expected to produce." (Rule 4, subd. (d).) Further, each adjustment is to receive separate and serious consideration. (*Midstate Theatres, Inc.* v. *County of Stanislaus, supra,* 55 Cal.App.3d at p. 881.)

B. *The Experts' Appraisals*

The Assessor's experts valued the subject property using both comparable sales and discounted future income. Mr. Robert Campbell-Taylor appraised the property using the comparable sales approach. However, Mr. Campbell-Taylor also developed a capitalization rate. Mr. Harold Bertholf relied primarily on the income approach to determine the value of Texaco's holdings in the Kern River. In contrast, Texaco relied solely on the income method as testified to by its primary expert, Mr. Richard Miller.

1. *The Campbell-Taylor appraisal.*

The first step in Mr. Campbell-Taylor's analysis was the selection of sales which he felt were comparable. The properties Mr. Campbell-Taylor chose were sold near the lien date, had a production projection similar to Kern River's, and were of sufficient size.

Mr. Campbell-Taylor's analysis was further limited to properties where the buyer had developed a net cash flow projection in conjunction with the sale. This projection provided the information necessary for extracting the discount rate, determining the proved reserves, and developing ratios to assist with making adjustments for the differences between the comparable property and the subject property.

However, a projected net cash flow is merely a prediction. The petroleum engineers make their best estimate regarding the future production stream based on the information available to them. Nevertheless, the accuracy of these predictions is impacted by numerous variables, such as the known or foreseeable geological risks, the planned methods of operation, and the anticipated increases in production. The net cash flow prediction is further influenced by price increase and operating cost projections. Consequently, a projected net cash flow can range from very aggressive, i.e., optimistic in

terms of expectations for the property, to conservative, depending on the engineer's calculations regarding reserves, anticipated production increases, and production rates. As compared to conservative cash flow projections, aggressive projections carry a progressively higher risk of the buyer not obtaining the expected results.

Mr. Campbell-Taylor used this comparable sales information to calculate two factors, i.e., the dollars/barrel of oil equivalents and the capitalization rate. First, based on the acquisition cost of the property and the proved reserves, Mr. Campbell-Taylor determined the dollars/barrel of oil equivalents ($/BOE) for each of the sales. This factor is a per unit representation of sales price calculated by dividing the acquisition cost, i.e., the sum of the purchase price and the anticipated capital expenses, by the number of barrels of proved reserves. The quotient is the $/BOE.

To appraise the Kern River property, Mr. Campbell-Taylor first calculated the average $/BOE for the selected comparable sales. Mr. Campbell-Taylor used this average as a starting point and then made adjustments to account for the high quality of Kern River. For example, for the 1984 appraisal, Mr. Campbell-Taylor judged Kern River to be 5 percent better than the selected comparable sales based on weighting the perceived risks for each of the properties. Mr. Campbell-Taylor's methods of manipulating the data in order to make the required adjustments are discussed below. After figuring the appropriate $/BOE for Kern River for each appraisal year, Mr. Campbell-Taylor then multiplied that figure by the Kern River proved reserves. From this number Mr. Campbell-Taylor subtracted the estimate of the required capital infusion to reach a fair market value for the property.

To assist with adjusting the data to compensate for the differences between a comparable sale and Kern River, Mr. Campbell-Taylor developed certain ratios to apply to each sale. Mr. Campbell-Taylor considered the ratios to be tools to help him quantify the risks associated with each property.

A gross income ratio was employed by Mr. Campbell-Taylor to illustrate the relative profitability of properties. Using figures taken from the buyer's cash flow analysis, Mr. Campbell-Taylor calculated this ratio by dividing the projected gross income by the sum of the projected net income and the projected capital costs. The higher this ratio, the less profitable the property. In other words, the operating expenses for a property with a relatively high gross income ratio consume a greater percentage of the gross income than a property with a lower gross income ratio. The more profitable a property is, the higher its fair market value.

Mr. Campbell-Taylor also calculated what he called a capital ratio for each property. Again using figures from the buyer's cash flow analysis, Mr. Campbell-Taylor started with the sum of the purchase price and the present worth of the projected capital costs and then divided that figure by the purchase price. This ratio indicates the state of the development of the property. If no additional capital is required to develop the reserves, the ratio is 1. This is the lowest risk position. The property is already in full production and consequently, the projected oil stream is more certain. The buyer's oil stream estimate is not based on increasing production through future development. Thus, the higher the capital ratio, the higher the risk of not obtaining the projected income.

The third ratio used by Mr. Campbell-Taylor also related to the future development of the property. To calculate this ratio, Mr. Campbell-Taylor took the current rate of oil production and divided it by the buyer's projection of what the maximum rate of production would be. This figure, referred to as the initial rate ratio, again sheds light on the risk inherent in the buyer's projection. It is a measure of the demonstrated production level for the property up to the time of acquisition versus the anticipated production over the life of the property. Thus, if the ratio demonstrates that a substantial increase in production is anticipated, there is a corresponding risk that this increase will not meet the buyer's expectations. Consequently, this ratio is a reflection of the buyer's level of optimism with respect to the net cash flow projection.

Mr. Campbell-Taylor testified he used these ratios as tools to help him make allowances for the differences between the Kern River property and the sales he was using as comparables. To do so, Mr. Campbell-Taylor calculated the ratios for each transaction and then determined what the average ratio was. He then calculated the same three ratios for Kern River based on Texaco's projected net cash flow and compared the Kern River ratios to the average ratios. Based on the relationships between the ratios, Mr. Campbell-Taylor made a subjective judgment regarding the adjustment which should be made to the average $/BOE for Kern River. Thus, by synthesizing the sales data in this manner, Mr. Campbell-Taylor was able to better understand the relationships between Kern River and these comparable properties.

Although Mr. Campbell-Taylor did not use the income approach in appraising Kern River, he nevertheless suggested a range for an appropriate capitalization rate. Mr. Campbell-Taylor first extracted the capitalization rates from the comparable sales data. He then used the ratios discussed above to compare the cash flow for Kern River to the cash flows for the

comparable sales in order to assess the risk tolerances inherent within those cash flows. The higher the risk, the higher the capitalization rate that should be applied.

The discount rates for the 1984 comparable sales ranged from 16.6 percent to 32.6 percent. Nevertheless, Mr. Campbell-Taylor suggested a range for Kern River for that year of 12 percent to 14 percent. Mr. Campbell-Taylor chose a lower discount rate on the grounds that the cash flow projection for Kern River was conservative as compared to the other sales and that those comparable sales were of lower quality properties. Similarly, for 1985, Mr. Campbell-Taylor again suggested a capitalization rate range of 12 percent to 14 percent where the comparable sales ranged from 13.1 percent to 28.6 percent. He believed 12 percent to 14 percent was appropriate for Kern River based on the perceived risks involved with, and the quality of, the comparable sales relative to Kern River.

2. *The Bertholf appraisal.*

Mr. Bertholf appraised Kern River using both the income and the comparable sales methods. At issue is his calculation of the capitalization rate.

Utilizing the extensive data available, Mr. Bertholf prepared a cash flow projection for Kern River. Mr. Bertholf also analyzed the projections prepared by Texaco. Mr. Bertholf concluded both his and Texaco's projections were conservative. Mr. Bertholf noted that predictions regarding a property with a long history of intense development, such as Kern River, can be made with reasonable certainty in that they are based on the continuation of an existing operation. Consequently, Mr. Bertholf concluded a lower capitalization rate was warranted for Kern River. He suggested a rate of 15 percent.

Mr. Bertholf developed this capitalization rate by using both a market comparison and a band-of-investment analysis. In constructing a market-derived rate, Mr. Bertholf relied, in part, on the sales analysis done by Mr. Campbell-Taylor. Together, he and Mr. Campbell-Taylor reviewed the information extracted from this sales analysis. For each comparable sale, they discussed the rate of return, i.e., the discount rate, the types of projections that were made, and the risks inherent in those projections. Thereafter, they compared this information to the Kern River property. Each appraiser then constructed his own capitalization rate.

In adjusting the comparable sales data to account for the differences between those properties and Kern River, both Mr. Bertholf and Mr. Campbell-Taylor included the income ratio, capital ratio, and rate ratio in their

analyses. Mr. Bertholf stated he used these ratios as tools to help him make judgments regarding the different levels of risk associated with the various cash flow projections. Mr. Bertholf explained that, after deriving a discount rate from a number of sales, the appraiser has to then adjust the discount rate to be commensurate with the cash flow to which it is going to be applied. Mr. Bertholf also applied what he termed his "confidence factor" to each sale. He defined this confidence factor as being a judgment of the likelihood of the income stream projection coming true based on his assessment of the sale.

Mr. Bertholf also independently developed a capitalization rate based on a band-of-investment analysis. This alternative method requires the appraiser to arrive at a weighted average cost of capital to buy a parcel of real estate, in this case oil producing real estate. Mr. Bertholf explained that the band-of-investment analysis weighs the rates of return appropriate for mortgage money, i.e., the debt, on the one hand, and for the equity, i.e., the down payment, on the other. The weighted average is an indication of the capitalization rate applicable to a specific property.

The first step in performing this calculation is to determine the debt level that is appropriate for the property. Based on a published market data analysis of oil and gas properties for the years 1960 through 1969, Mr. Bertholf concluded a 70 percent debt and 30 percent equity ratio was proper. In response to Texaco's argument that the debt/equity ratio should be 30/70, Mr. Bertholf stated that, while 30/70 might be appropriate for a corporation, it was not appropriate for an income producing oil property. More money can be borrowed against a specific property which is generating income to pay back the loan than can be borrowed against a large company whose assets may include a substantial number of properties which are currently nonproductive.

After a ratio has been decided on, the appraiser must determine the cost of the debt and the return on the equity. Mr. Bertholf concluded the proper debt cost for the 1984 lien date was 12 percent. Texaco has not challenged the debt figures on appeal. However, the cost of equity, i.e., the rate of return, calculations are in dispute.

Mr. Bertholf calculated the equity component using both historical and theoretical models. The historical analysis focused on actual long-term rates of return for oil companies. To this historic rate of return, Mr. Bertholf made two adjustments. One for anticipated inflation and another to equate oil company stock to the general stock index. The latter adjustment is called the beta factor. This calculation indicated an anticipated rate of return of 13.4 percent.

To make an equity return calculation based on theoretical concepts, Mr. Bertholf relied on three separate models. The first was the capital asset pricing model (CAPM). This model was developed to make comparisons of short-term investments for the purpose of evaluating a stock portfolio's performance. Thus, it had to be modified to allow Mr. Bertholf to develop a CAPM equity return rate for a long-term investment. However, this model's applicability to long-term investments has not been demonstrated.

To use the CAPM in this case, Mr. Bertholf started with a long-term riskless rate expectation and adjusted it for the risk inherent in the asset being valued. For this riskless rate component, Mr. Bertholf used the long-term government bond yield. However, Mr. Bertholf used a historic bond yield average rather than the yield on a particular date to avoid an unreliable rate of return prediction based on a short-term fluctuation in market rates.

Mr. Bertholf also applied the earnings/price ratio and the discounted cash flow models to calculate a theoretical equity return. These models are also based on stock market calculations.

Mr. Bertholf then averaged the results from all three models to reach an anticipated equity return of 12.6 percent. However, Mr. Bertholf expressed concern regarding the validity of these theoretical calculations in that they are based on the value of stock in the stock market. Since stock prices are not directly tied to the value of the underlying assets owned by the companies, the rates of return on the stocks are not an accurate representation of what the rates of return should be on those underlying assets.

Despite the inherent limitations of the above models, Mr. Bertholf derived discount rates using the band-of-investment method. Mr. Bertholf concluded 14 percent was the appropriate rate for all three years in question.

3. *The Miller appraisal.*

Texaco relied primarily on the appraisals made by Richard Miller to support its challenge to the Kern River assessments. Mr. Miller valued the property by way of the income approach only. To develop a capitalization rate, Mr. Miller used both the market comparison and the band-of-investment methods.

To determine a market-derived capitalization rate, Mr. Miller relied on an arithmetic average. He took the position that all the cash flow streams and discount rates which were developed by the buyers of oil and gas properties were directly comparable to one another. Consequently, Mr. Miller used all

32 of the County oil and gas property sales with cash flow projections which occurred during the relevant time period for his analysis. Mr. Miller then added up the discount rates he extracted from these sales and divided by 32 to arrive at a suggested discount rate of 28.1 percent. He felt the cash flow calculation dissolved or mitigated the differences between the individual properties. Thus, Mr. Miller made no adjustments to the comparable sales to account for risk differences in the projections.

Mr. Miller's discount rates derived from the band-of-investment method were also substantially higher than Mr. Bertholf's. Mr. Miller suggested rates of 25.6 percent, 23.89 percent and 19.34 percent for the 1984, 1985, and 1986 lien dates respectively. In contrast, Mr. Bertholf determined the capitalization rate should be 14 percent for those years. This disparity can be attributed, at least in part, to Mr. Miller's using both a 30/70 debt equity ratio, rather than a 70/30 debt equity ratio, and a higher long-term government bond yield rate for the CAPM calculation.

## C. *The Board's Decision*

As discussed above, the Board found substantial evidence supported the use of the income approach to value for assessing this property. However, the Board also considered the comparative sales approach as a " 'checking' " mechanism to guard against mathematical distortions inherent in the income approach. The Board noted that, although the comparable sales approach is generally the preferred method of valuing real property, the comparable sales available in this case required extensive and complex adjustments to account for the dissimilarities between those comparable sales and Kern River.

With respect to the capitalization rate, the Board found that an "overwhelming" preponderance of the evidence supported the Assessor's determination that a 15 percent rate was appropriate. The Board believed that the Assessor's method of determining a capitalization rate was the most accurate and reliable. On the other hand, the Board found Texaco's evidence concerning the selection of a capitalization rate to be "inconsistent, illogical, not in compliance with the requirements of Rule 8[, subd.] (g)(1) and (2), inconsistent with sound appraisal practice, without substantial basis, and not credible."

The Board further found the derivation of the capitalization rate should be based on a market analysis rather than a band-of-investment analysis. The Board determined the parties' use of a theoretical construct which was designed to analyze short-term stock market investments, i.e., the CAPM

method, was inappropriate for valuing a long-term real property investment such as Kern River.

In connection with the market-derived rate, the Board found the Assessor properly developed the capitalization rates from the sales of comparable oil and gas properties. The Board concluded the Assessor exercised proper appraisal judgment and sound appraisal technique in both the selection of the sales, and the adjustment of the capitalization rates extracted from those sales, to account for engineering and economic dissimilarities.

In contrast, the Board found Mr. Miller's selection of a capitalization rate through mere mathematical averaging was inappropriate. The Board stated that Mr. Miller's blind application of a mathematical average to the Kern River property, without the exercise of any substantial appraisal judgment, rendered his method unreliable. The Board concluded that, due to the unique characteristics of the property, Kern River was not amenable to valuation through the mechanism of a statistical average.

Thus, the Board rejected Texaco's contentions that the Assessor's valuation methodology was flawed, improper, inaccurate, arbitrary, capricious, or discriminatory. Rather, the Board found, as a matter of fact, that Texaco did not produce sufficient evidence to establish that the Assessor did not follow the requirements of law in conducting his assessment of Kern River. Thus, the Assessor was entitled to the benefit of the presumption that he properly performed his duty and assessed the subject property fairly, accurately, and on a uniform and nondiscriminatory basis.

DISCUSSION

*Standard of Review*

In reviewing a property tax assessment, the court must presume the assessor properly performed his duty and that, consequently, the assessment was both regularly and correctly made. (*Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d at p. 21; rule 321.) Thus, the taxpayer has the burden of proving the property was improperly assessed. (*Hunt-Wesson Foods, Inc.* v. *County of Alameda* (1974) 41 Cal.App.3d 163, 180 [116 Cal.Rptr. 160].)

When the taxpayer claims a valid appraisal method was erroneously applied, the trial court is limited to reviewing the administrative record. In such a case, the court may overturn the assessment appeals board's decision only if there is no substantial evidence in the administrative record to

support it. (*Dominguez Energy* v. *County of Los Angeles, supra,* 56 Cal.App.4th at p. 852.) In conducting its review, the trial court neither weighs the evidence in the administrative record nor exercises its independent judgment. Rather, the court examines the entire record to determine if there is substantial evidence to support the findings of the board. (*Norby Lumber Co.* v. *County of Madera* (1988) 202 Cal.App.3d 1352, 1362 [249 Cal.Rptr. 646].) The taxpayer has no right to a trial de novo in the superior court to resolve conflicting issues of fact concerning the taxable value of the property. (*Ibid.*)

However, if the taxpayer challenges the validity of the valuation method itself, the court is faced with a question of law. (*Norby Lumber Co.* v. *County of Madera, supra,* 202 Cal.App.3d at p. 1363.) When reviewing this legal question, the trial court need not determine whether there was substantial evidence to support the assessment appeals board's decision but, rather, must inquire into whether the challenged valuation method is arbitrary, in excess of discretion, or in violation of the standards prescribed by law. (*Prudential Ins. Co.* v. *City and County of San Francisco* (1987) 191 Cal.App.3d 1142, 1148 [236 Cal.Rptr. 869].)

I. *Whether the Assessor's experts based their valuation opinions on invalid appraisal methods.*

 In challenging the assessments at issue, Texaco focuses primarily on its argument that the Assessor's experts used an invalid appraisal method. Specifically, Texaco asserts that the three ratios calculated by Mr. Campbell-Taylor, i.e., the gross income ratio, the capital ratio, and the initial rate ratio, did not comply with the legal standards set forth in *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] and *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [34 A.L.R. 145] (*Kelly/Frye*).[3] According to Texaco, these ratios constitute new scientific procedures or techniques and, thus, the Assessor was required to demonstrate that such ratios are generally accepted in the appraisal community. Texaco argues that, because such a foundational showing was not made, Mr. Campbell-Taylor's $/BOE calculation and both Mr. Campbell-Taylor's and Mr. Bertholf's market-derived capitalization rate calculations were invalid as a matter of law.

The County first replies to Texaco's position by noting that the Board is not bound by technical rules relating to witnesses and evidence. (§ 1609;

---

[3]In *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [113 S.Ct. 2786, 125 L.Ed.2d 469], the United States Supreme Court held that *Frye* v. *United States, supra,* 293 Fed. 1013, had been superseded by the adoption of the Federal Rules of Evidence in 1975. This ruling resulted in a liberalization of the *Frye* standard. However, California has retained the *Kelly/Frye* formulation as a prerequisite to the admission of expert testimony regarding new scientific methodology. (*People* v. *Leahy* (1994) 8 Cal.4th 587 [34 Cal.Rptr.2d 663, 882 P.2d 321].)

rule 313; *Norby Lumber Co.* v. *County of Madera, supra,* 202 Cal.App.3d at p. 1362.) The County takes the position that the *Kelly/Frye* standard is inapplicable for this reason. However, the *Kelly/Frye* rule has been applied in other administrative hearing contexts where similarly relaxed rules of evidence are employed. (*Seering* v. *Department of Social Services* (1987) 194 Cal.App.3d 298, 310 [239 Cal.Rptr. 422].) In *Seering,* the court concluded such an application served the purpose of the rule in that both the administrative law judge and the superior court judge reviewing the administrative record, could be "misled by the 'aura of infallibility' that may surround unproven scientific methods and might 'ascribe an inordinately high degree of certainty' to the expert's opinion." (*Ibid.*) Nevertheless, we hold *Kelly/Frye* is inapplicable in this case.

 Through application of the *Kelly/Frye* requirements, California courts have "long been willing to forego admission of 'new' scientific methods used to detect, analyze, or produce evidence absent a credible threshold showing that 'the pertinent scientific community no longer views them as experimental or of dubious validity.' [Citations.]" (*People* v. *Webb* (1993) 6 Cal.4th 494, 524 [24 Cal.Rptr.2d 779, 862 P.2d 779].) Although the standards imposed by this rule are clear, the definition of a " 'new scientific technique' " is not. (*People* v. *Stoll* (1989) 49 Cal.3d 1136, 1155 [265 Cal.Rptr. 111, 783 P.2d 698].) Thus, application of this standard has been determined by reference to its "narrow 'common sense' purpose, i.e., to protect the jury from techniques which, though 'new,' novel, or ' "experimental," ' convey a ' "misleading aura of certainty." ' [Citations.]" (*Id.* at pp. 1155-1156.)

 The application of *Kelly/Frye* has involved two discernible themes. First, the techniques or methods must be "new." (*People* v. *Leahy, supra,* 8 Cal.4th at p. 605; *People* v. *Stoll, supra,* 49 Cal.3d at p. 1156.) Thus, *Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process or theory which is *new* to both science and law. (*People* v. *Stoll, supra,* 49 Cal.3d at p. 1156.)

 In this case, Mr. Campbell-Taylor and Mr. Bertholf both testified that the $/BOE and the income ratio calculations have been commonly used in the oil and gas industry for valuation purposes. Thus, these two "techniques" are not new. However, according to Mr. Campbell-Taylor, he developed the initial rate ratio and the capital ratio to assist him in valuing the property. Consequently, the use of these ratios arguably constitutes a "new technique." Nevertheless, these ratios do not satisfy the second *Kelly/Frye* prerequisite, i.e., they do not constitute a "scientific technique."

 "[A] technique may be deemed 'scientific' for purposes of *Kelly/Frye* if 'the unproven technique or procedure appears *in both name and*

*description* to provide some definitive truth which the expert need only accurately recognize and relay to the jury.' [Citation.]" (*People* v. *Leahy, supra,* 8 Cal.4th at p. 606.) In such a situation, the *Kelly/Frye* formula exists to prevent lay jurors from giving " 'considerable weight to "scientific" evidence when presented by "experts" with impressive credentials.' " (*People* v. *Hood* (1997) 53 Cal.App.4th 965, 969 [62 Cal.Rptr.2d 137].) The goal is to avoid the introduction of evidence which carries with it a misleading aura of certainty or a posture of mystic infallibility in the eyes of the jury. (*Ibid.*) Thus, absent some special feature which effectively blindsides the trier of fact, expert opinion testimony is not subject to *Kelly/Frye.* (*People* v. *Stoll, supra,* 49 Cal.3d at p. 1157.)

Further, *Kelly/Frye* does not apply to an expert's personal opinion as distinguished from proof based on a scientific method. Triers of fact can temper their acceptance of such a personal opinion "with a healthy skepticism born of their knowledge that all human beings are fallible." (*People* v. *McDonald* (1984) 37 Cal.3d 351, 372 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].) "In contrast, factfinders may not view scientific evidence with such skepticism," but rather will " 'tend to ascribe an inordinately high degree of certainty' to such evidence." (*In re Amber B.* (1987) 191 Cal.App.3d 682, 686-687 [236 Cal.Rptr. 623].) Thus, expert opinion testimony is subjected to the *Kelly/Frye* rule only when the opinion is based upon a new method of proof of fact rather than being a personal opinion based upon the expert's own experience. (*Seering* v. *Department of Social Services, supra,* 194 Cal.App.3d at p. 314.)

 Here, neither Mr. Campbell-Taylor nor Mr. Bertholf ascribed a "definitive truth" to the ratios at issue. The ratios were not used to convert raw data into an objective and infallible answer. Rather, the purpose behind the ratios was to synthesize and quantify the data gleaned from the projected net cash flows. With the data organized in this manner, the experts were better able to analyze the sales and compare them to the subject property. As the experts explained, these ratios were merely tools which assisted them in making the adjustments required by the California Code of Regulations.

Thus, the ratios employed by Mr. Campbell-Taylor and Mr. Bertholf raise none of the concerns addressed by *Kelly/Frye.* They did not carry a misleading aura of scientific infallibility. In a sense, the ratios were merely illustrations of certain factors relied on, and predictions made by, the various buyers. (Cf. *People* v. *Hood, supra,* 53 Cal.App.4th at p. 969.) Consequently, the expert opinion testimony regarding the valuations where these ratios were considered, i.e., the appraisals using the comparable sales approach and the market-derived discount rate, was not subject to *Kelly/Frye.*

Similarly, Texaco's argument that these appraisal methods fail to satisfy the less restrictive federal test set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc., supra,* 509 U.S. 579 is unavailing. The purpose of the *Daubert* guidelines is to "ensure that any and all *scientific* testimony or evidence admitted is not only relevant, but reliable." (*Id.* at p. 589 [113 S.Ct. at p. 2795], italics added.) As discussed above, the ratios did not constitute "scientific evidence." Therefore, *Daubert* is inapplicable.

■ Texaco further contends that, even if *Kelly/Frye* is inapposite, the challenged evidence is inadmissible under section 1609. Section 1609 provides that any relevant evidence may be admitted at an equalization hearing "if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs." Texaco argues that, because the ratios were newly created, responsible persons would not rely on them.

However, as discussed above, the ratios were employed to illustrate differences between the various sales that were being examined. Thus, the experts did not rely on the ratios alone to appraise the property. Rather, the ratios merely aided the appraisers in making the adjustments required by rules 4 and 8. Consequently, section 1609 does not render the Assessor's ratio evidence inadmissible as claimed by Texaco.

Texaco also argues that, in using these ratios, the appraisers did not make specific adjustments between the comparable properties as required by law. (Rule 4, subd. (d).) Texaco asserts that this alleged error invalidated all appraisals in which the ratios were used as a factor, i.e., the values arrived at by either calculating the $/BOE or capitalizing the projected income with the market-derived discount rate.

In *Main & Von Karman Associates* v. *County of Orange, supra,* 23 Cal.App.4th 337, the court found the assessor had violated the standards prescribed by law when he made no adjustments to the comparable sales. There, the procedure followed by the assessor was to give the raw data to the assessment appeals board and state that his opinion was within the range of values shown by the data. The court held the assessor was obligated to make adjustments to the raw data before presenting the comparable sales as evidence to the assessment appeals board. The assessor's failure to do so rendered the evidence presented to the board legally incompetent. The court noted " 'Such an approach does not square with the spirit of rule 4 which carefully lists specific adjustments that are to be made, nor with the reasoning of the state board's general appraisal manual which states that, "Each adjustment should receive separate and serious consideration". . . .' " (*Id.* at p. 343.)

Based on *Main & Von Karman,* Texaco asserts the Assessor's experts violated rule 4 when they adjusted their comparable sales by using only their ratios. However, unlike *Main & Von Karman,* the appraisers here made separate adjustments to each of the comparable sales. In fact, the ratios were developed for this purpose. The appraisers used the ratios to quantify several types of risk factors associated with each projected net cash flow in order to make the necessary specific adjustments.

Texaco also argues the appraisers violated rule 4 in that they did not separately consider certain factors associated with each sale. According to Texaco, the appraisers were required to include items such as capital costs, operating costs, and geology in their analyses. However, the experts testified that variations in these types of factors were already accounted for in the projected cash flows.

By way of contrast, it should be noted that Texaco's own expert, Mr. Miller, did not make separate adjustments to the comparable sales. In attempting to use a strict mathematical formula to calculate the discount rate, Mr. Miller gave no consideration to the properties' differences in physical attributes, location, or expected income as compared with Kern River.

In sum, the Assessor's appraisals complied with legal standards. Contrary to Texaco's position, the methodologies employed by the Assessor's experts did not violate either the *Kelly/Frye* doctrine or rule 4.

II. *Whether the Board's decision is supported by substantial evidence.*

In addition to challenging the legality of the Assessor's appraisal methods, Texaco argues the Board's decision was not supported by substantial evidence. As discussed above, when such a claim is made, the court neither weighs the evidence nor exercises its independent judgment. Rather, it reviews the entire record to determine if there is substantial evidence to support the findings of the administrative agency. (*Norby Lumber Co.* v. *County of Madera, supra,* 202 Cal.App.3d at p. 1362.)

As noted earlier, assessments are presumed correct, and the burden is on the taxpayer to show an assessment is improper. (*Midstate Theatres, Inc.* v. *County of Stanislaus, supra,* 55 Cal.App.3d at p. 885.) Here, the Board found, as a matter of fact, that Texaco "did not produce sufficient evidence to establish that the Assessor had not followed the requirements of law in conducting his assessment of the subject property." Thus, Texaco did not meet its initial burden of presenting substantial probative evidence of values different from the Assessor's values. The Board's conclusion in this regard

is supported by the record. As discussed above, Texaco's primary expert, Mr. Miller, used a method for calculating a market-derived discount rate which did not comply with the State Board of Equalization Rules.

Texaco does not address this finding on appeal. Texaco incorrectly asserts that the case it presented before the Board is irrelevant. (*Mission Housing Development Co.* v. *City and County of San Francisco* (1997) 59 Cal.App.4th 55, 84 [69 Cal.Rptr.2d 185].) Nevertheless, even if Texaco's deficiency in this regard is overlooked, Texaco still has not met its burden of demonstrating error. The Board's determinations are supported by the record.

Texaco again relies on the alleged invalidity of the ratios developed by Mr. Campbell-Taylor in making its sufficiency-of-the-evidence claim. Texaco asserts that, because the valuations based on the comparable sales approach and on the income approach with a market-derived capitalization rate were dependent on these ratios, those valuations are not supported by sufficient evidence. However, as discussed above, the use of the ratios in adjusting the comparable sales complied with the standards prescribed by law. Therefore, the fact that the experts applied these ratios does not undermine the Board's conclusion that the Assessor's value determinations were supported by an overwhelming preponderance of the evidence.

Texaco further argues that Mr. Bertholf's band-of-investment derived capitalization rate is not supported by the record because Mr. Bertholf applied that method incorrectly. However, in the context of this appeal, whether Mr. Bertholf properly applied this method is, at most, tangential.

The Board concluded the preferred method to be employed in determining the capitalization rate was the " 'market-derived' " method set forth in rule 8, subdivision (g)(1). Both Mr. Miller and Mr. Bertholf included the CAPM methodology in their band-of-investment analyses. The Board found reliance on the CAPM in reaching a band-of-investment conclusion was inappropriate. The Board noted that this theoretical model was developed for the analysis of short-term stock market investments and had not been shown to be reliable for valuing long-term property investments. Consequently, argument regarding the evidence submitted by the parties on the band-of-investment method of deriving a discount rate is irrelevant. This method was not relied on by the Board in valuing Kern River.

Further, the issue of which party, if either, properly applied this method is a question of fact. Thus, the Board's determination on the merits of this issue is conclusive and must be affirmed unless no substantial evidence supports it. (*Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra*, 16 Cal.3d

at p. 23; *Domenghini* v. *County of San Luis Obispo* (1974) 40 Cal.App.3d 689, 697 [115 Cal.Rptr. 608].)

Both Mr. Bertholf and Mr. Miller testified extensively regarding this method, including how they derived the various factors for the equation. Texaco primarily objects to Mr. Bertholf's debt/equity ratio and cost of equity calculations.

Although the Board did not rely on this valuation testimony, it nevertheless gave it serious consideration. In so doing, the Board concluded the band-of-investment calculations and recommendations made by Mr. Miller were unreliable. The Board found Mr. Miller's analysis was flawed by his unrealistic construction of tax rates and his reliance on theoretical constructs such as CAPM. Further, Mr. Miller's conclusions were inconsistent with actual market data and historical returns achieved by the very oil companies he was analyzing. In contrast, the Board found "the Assessor's conclusions presented through his experts, Mr. Bertholf and Mr. Campbell-Taylor, to be well founded, supported by substantial credible evidence, and determined in compliance with Rule 8(g)(1) and (2)."

Texaco criticizes both the sales Mr. Bertholf chose to examine in developing a debt/equity ratio and the long-term riskless rate of return Mr. Bertholf used in deriving the cost of equity with the CAPM. Texaco relies on Mr. Miller's contrary testimony. Neither expert based his conclusion on clearly unreasonable assumptions so as to cause the opinion to have no evidentiary value. Faced with this contradictory expert testimony, the Board found Mr. Bertholf's testimony to be more credible. As noted by the Board, Mr. Bertholf's discount rate calculation was consistent with the actual market rates of return for oil and gas companies.

In sum, the evidence elicited is clearly sufficient to uphold the Board's findings.

DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondent.

Dibiaso, Acting P. J., and Harris, J., concurred.